**UNITED STATES NAVAL INSTITUTE,**
Plaintiff–Appellant,

v.

**CHARTER COMMUNICATIONS, INC.,**
and Berkley Publishing Group,
Defendants–Appellees.

**No. 576, Docket 88–7553.**

United States Court of Appeals,
Second Circuit.

Argued Jan. 4, 1989.

Decided May 24, 1989.

**1045**

Robert C. Osterberg, New York City (Abeles Clark & Osterberg, New York City, on the brief), for plaintiff-appellant.

Robert M. Callagy, New York City (Mark A. Fowler, Satterlee Stephens Burke & Burke, New York City, on the brief), for defendants-appellees.

Before KEARSE, CARDAMONE, and WINTER, Circuit Judges.

KEARSE, Circuit Judge:

Plaintiff United States Naval Institute ("Naval") appeals from a final judgment entered in the United States District Court for the Southern District of New York following a bench trial before Pierre N. Leval, *Judge,* dismissing its complaint against defendants Charter Communications, Inc., and Berkley Publishing Group (collectively "Berkley") for breach of contract and copyright infringement on account of Berkley's premature publication of the paperback edition of a bestselling book whose hardcover edition was published by Naval. The district court found that Berkley's early shipment of the paperback edition to retailers did not constitute publication and thus did not breach the parties' agreement or infringe Naval's rights under the copyright. *See* 687 F.Supp. 115 (1988). On appeal, Naval contends, *inter alia,* that this conclusion was error in light of the substantial retail sales of the paperback that occurred prior to the earliest publication date permitted by the contract. For the reasons below, we reverse the judgment and remand for further proceedings.

## I. BACKGROUND

### A. *The Events*

The principal events, according to the findings of the trial judge and the evidence at trial, were as follows. Naval, a small specialized publisher of books of naval interest, was the assignee of the author's copyright rights to the novel, *The Hunt for Red October* (*"Red October"* or the "Book"). Though Naval had been publishing hardcover books for a century, it had rarely published fiction, and few, if any, of its books had mass-market distribution. It had no experience in the publication of bestsellers.

Naval planned to publish the hardcover edition of the Book in October 1984 and sought to license a paperback reprint edition. It sent prepublication copies of the Book to the major mass-market paperback publishing companies and received an offer from Berkley. Naval then decided to hold an auction for the paperback rights to the Book, using, with Berkley's consent, the financial terms of Berkley's offer as the floor and giving Berkley the right to top the highest auction bid by 10 percent. Since Naval had never before conducted an auction for the paperback rights to one of its books, it sought advice from industry contacts on the proper procedures to follow. At the conclusion of the auction, Berkley exercised its right to top the highest bidder and thus won the paperback rights.

Berkley submitted its standard form paperback license agreement to Naval. Though there had been no discussion of the publication date for the paperback edition, standard practice in the industry was to delay the paperback version until one year after the month of the hardcover publication. Accordingly, Berkley filled in its form to indicate that the date of publication of the hardcover edition would be October 1984 and that October 1985 was the earliest permissible date for publication of the paperback edition. Naval made no change to this part of the form and the parties exe-

cuted the license agreement ("Agreement") on September 14, 1984. The Agreement provided that Berkley was to "publish the ... paperback edition not sooner than October 1985"; it did not define "publish."

Naval published its hardcover edition of *Red October* in October 1984. The Book reached the national bestseller lists in late 1984 and remained on those lists throughout the summer of 1985. By the end of August, more than 316,500 hardcover copies had been sold.

Consistent with the Agreement, Berkley designated *Red October* to be one of its "October 1985 New Titles." In accordance with its usual practice, Berkley then calculated backward from the "pub date" of October 1985 to establish its production, promotion, and distribution schedule. In January 1985, it began to organize its national promotional campaign for *Red October;* solicitation of orders and to-the-trade advertising began in April. Berkley's usual schedule for an October title required it to send the text of the work to the printer by August 8. After printing, an October book would normally be shipped to several hundred wholesalers and more than 5,000 retailers across the country early in September.

This schedule of printing and shipping was altered somewhat for *Red October.* Noting the progress of the hardcover edition of the Book and its unusually long presence on the national bestseller lists, Berkley accelerated its procedures, wanting to ensure that its paperback edition would be available in all retail outlets across the country no later than October 1, 1985. It arranged with its printer to have more than 1,400,000 copies of the Book ready for "early shipping" on August 26, 1985, making them available for sale in September. Though ordinarily a given shipment to retailers would include more than one title, the large number of copies printed enabled *Red October* to be shipped separately, perhaps making it more likely that retailers would promptly put it on sale.

In mid-August Naval learned of Berkley's plans for the early shipping and promotion of the paperback edition. The im-

minent availability of the paperback had already resulted in the cancellation of some orders for the hardcover edition, and a Berkley spokesperson advised Naval that distribution of the paperback would be completed by September 15 and that retail sales in some outlets would begin as early as August 31. Naval, wishing to sell as many hardcover copies as possible prior to the October publication date of the paperback edition, and hoping that the hardcover edition would reach the top of the New York Times bestseller list, which would have entitled Naval to a substantial bonus on a sale of the Book's movie rights, sought to forestall Berkley's early shipments. Contending that Berkley's promotional activities and shipping plans were in breach of the Agreement and constituted copyright infringement, Naval asked Berkley to delay the shipment and sale of, and promotional campaign for, the paperback edition until October. Berkley disputed Naval's claim of wrongdoing but offered to delay shipment one week until September 3 and to postpone advertising the paperback edition to the public until October 1.

B. *The Present Action and the Trial Court's Decision*

Dissatisfied with Berkley's proposed compromise, Naval commenced the present action on August 26, 1985, seeking, *inter alia,* a preliminary injunction prohibiting Berkley from "shipping, distributing, selling or offering to distribute" copies of the Book prior to October 1, 1985. After limited expedited discovery, the district court denied the preliminary injunction motion on September 3, 1985, finding, *inter alia,* that the Agreement did not unambiguously prohibit shipments of the paperback edition prior to October, that Berkley would suffer harm if the motion were granted, and that Naval had failed to establish irreparable injury to itself from the limited retail sales that were anticipated prior to October, even if such sales would constitute a breach of the Agreement.

As soon as the preliminary injunction was denied, Berkley began shipping all copies of the paperback previously held in

warehouses. By mid-September, thousands of copies of the paperback version of *Red October* were available for retail sale in hundreds of stores, and by September 23, Berkley had sold nearly 1,400,000 copies of the paperback, some 40 percent of which went directly to retail outlets. At trial, Naval introduced Berkley's internal reports of the bestseller lists at the major national bookstore chains, which showed that by mid-September Berkley's paperback edition of *Red October* was already near the top of each of these lists. "For the week ending September 20, the Waldenbook and B. Dalton chains reported to Berkley that *Red October* was their second and third largest volume paperback seller respectively, based on the aggregate sales of 836 Walden stores and 679 B. Dalton stores.... During the following week the book reached an additional 57 Walden stores and 48 Dalton stores; and sales increased substantially." 687 F.Supp. at 118.

By late September 1985, Berkley had earned more than $3.1 million on its sales of the paperback edition of the Book. These sales cut sharply into sales of the hardcover edition. For the six months preceding September 1985, hardcover sales had averaged approximately 46,000 copies per month; after the paperback appeared in September, sales of the hardcover edition immediately declined by more than 80 percent, and during the next six months hardcover sales averaged only some 3,000 copies per month.

Berkley's position in the litigation, presented principally through the testimony of its president and of senior officers of unaffiliated publishing houses, was that its scheduling of the shipment and sale of its paperback edition was in accordance with the trade usage of the term "publish" and with industry custom concerning the scheduling of the shipment and sale of books.

The trial court agreed with Berkley's contentions. Though it did not make a finding as to the precise meaning of the term "publish," it found that " 'publication date' is uniformly understood in the industry to refer to the time when the concentrated selling effort begins, and not the time of shipment to outlets." 687 F.Supp. at 117. It found that industry practice was to ship a book three-to-six weeks prior to the date of "publication" and that Berkley's shipping dates, both in general and with respect to *Red October*, conformed to industry practice and were not inconsistent with a publication date of October 1, 1985. Though Naval argued that it was unaware of such custom and trade usage, the court stated that "whether plaintiff did or did not in fact know of the industry practice is irrelevant," *id.* at 120; having operated as a publisher for a century, Naval must be presumed to have knowledge of these customs and practices.

The court concluded that Berkley's conduct with respect to its publication of the paperback edition of *Red October* was neither copyright infringement nor a breach of the Agreement. Having concluded that Berkley's shipments did not breach the contract, the court did not discuss the question of whether the Agreement was breached by the pre-October retail sales.

Naval's complaint was dismissed, and this appeal followed.

## II. DISCUSSION

On appeal, Naval contends that it is entitled to a ruling in its favor on liability principally on the grounds (1) that the contractual provision licensing Berkley to "publish the ... paperback edition not sooner than October 1985" unambiguously prohibited Berkley's pre-October shipments of that edition to booksellers, and (2) that Berkley's unrestricted release of paperback copies of the Book for general circulation was an act of publication. In addition, Naval contends that the trial court erred in admitting evidence of Berkley's general operations, especially those after the Agreement was entered into, and of customs and practices in the publishing industry, and that the errors in the evidentiary rulings entitle Naval at least to a new trial. We conclude that Berkley's actions, causing the Book to become a bestselling paperback prior to October 1985, constituted publication not permitted by the Agreement.

## A. *Interpretation of the Agreement as a Question of Fact*

■ Preliminarily, we note that the trial court properly undertook to analyze the term "publish" as used in the Agreement as a question of fact rather than a question of law. Under New York law, which the parties adopted in the Agreement, the meaning of a contract is a question of law only if "the language of the contract is unambiguous, and reasonable persons could not differ as to its meaning." *Rothenberg v. Lincoln Farm Camp., Inc.*, 755 F.2d 1017, 1019 (2d Cir.1985); *see Amusement Business Underwriters v. American Int'l Group*, 66 N.Y.2d 878, 880, 498 N.Y. S.2d 760, 763, 489 N.E.2d 729, 732 (1985) (mem.); *West, Weir & Bartel, Inc. v. Mary Carter Paint Co.*, 25 N.Y.2d 535, 540, 307 N.Y.S.2d 449, 452, 255 N.E.2d 709, 712 (1969). *But cf. Sutton v. East River Savings Bank*, 55 N.Y.2d 550, 554, 450 N.Y. S.2d 460, 462–63, 435 N.E.2d 1075, 1077–78 (1982) (court may decide meaning of even an ambiguous contract on motion for summary judgment if party opposing motion fails to come forward with admissible extrinsic evidence); *Hartford Accident & Indemnity Co. v. Wesolowski*, 33 N.Y.2d 169, 172, 350 N.Y.S.2d 895, 898, 305 N.E.2d 907, 909 (1973) (same). The meaning of a contract term that is susceptible to at least two reasonable interpretations is generally an issue of fact, requiring the trier of fact to determine the parties' intent. *See, e.g., Rothenberg v. Lincoln Farm Camp., Inc.*, 755 F.2d at 1019; *Amusement Business Underwriters v. American Int'l Group*, 66 N.Y.2d at 880, 498 N.Y.S.2d at 763, 489 N.E.2d at 732; *M. O'Neil Supply Co. v. Petroleum Heat & Power Co.*, 280 N.Y. 50, 56, 19 N.E.2d 676, 679 (1939).

Though Naval urges us to rule that the Agreement's use of the term "publish" was clear and unambiguous and that the court therefore should not have admitted any extrinsic evidence as to its meaning, we disagree. While the Agreement uses the terms "publish" and "publication" repeatedly, it does not define them, nor does a precise meaning emerge from the contexts in which the terms are used. As the district court noted, the Agreement's prohibition on publishing sooner than October might reasonably be read to preclude a publisher from taking any steps toward publication, including printing and trade advertising, prior to October; or to bar any public revelation of the contents before October, as in the technical copyright sense; or to preclude any pre-October shipments; or to prohibit only pre-October retail sales. 687 F.Supp. at 118. The interpretation most strongly urged by Naval was that the Agreement precluded pre-October shipping. Though the parties could have so agreed, we hardly think such a restriction, which would have precluded even shipping with the understanding that the containers could not be opened until October 1, was the necessary implication of the term "publish." While the interpretation urged by Naval was perhaps a permissible one, the other interpretations hypothesized by the court were also reasonable, and we therefore agree with the district court that the term "publish" was ambiguous.

In determining the meaning of an ambiguous contract term, the finder of fact seeks to fathom the parties' intent. That intent may be proven by extrinsic evidence, *Amusement Business Underwriters v. American Int'l Group*, 66 N.Y.2d at 880–81, 498 N.Y.S.2d at 763, 489 N.E.2d at 732; *67 Wall Street Co. v. Franklin National Bank*, 37 N.Y.2d 245, 248, 371 N.Y.S.2d 915, 918, 333 N.E.2d 184, 186 (1975) (evidence of "surrounding facts and circumstances"), including evidence of trade usage, *Edison v. Viva Int'l, Ltd.*, 70 A.D.2d 379, 383, 421 N.Y.S.2d 203, 205 (1st Dept. 1979); *Walk-in Medical Center, Inc. v. Breuer Capital Corp.*, 818 F.2d 260, 264 (2d Cir.1987); N.Y.U.C.C. § 2–202(a) (McKinney 1964); 3 A. Corbin, *Corbin on Contracts* § 556, at 240–42 (1960) ("Usages and customs may be proved ... to aid in interpretation of the words of the parties .... The purpose of such proof ... is generally to ascertain and to give effect to the intention of the parties—or the intention and meaning of the party whose intention and meaning should be held to prevail."). Accordingly, the district court

properly ruled that evidence of industry custom and practice was admissible at trial.

## B. *The Meaning of the Agreement*

To the extent that they are findings of fact, the trial court's interpretations of an ambiguous contract are entitled to considerable deference, and we may not overturn them unless they are "clearly erroneous." Fed.R.Civ.P. 52(a); *Anderson v. City of Bessemer City,* 470 U.S. 564, 573–74, 105 S.Ct. 1504, 1511–12, 84 L.Ed.2d 518 (1985). Where there are two permissible views of the evidence, the court's pure findings of fact cannot be termed clearly erroneous. *Id.* at 574, 105 S.Ct. at 1512. To the extent that they are mixed findings of fact and law, such as the imputation of constructive knowledge, *see, e.g., Blakemore v. Coleman,* 701 F.2d 967, 970 (D.C.Cir.1983), the trial court's findings are reviewable for error, not just clear error: "Rule 52(a) does not inhibit an appellate court's power to correct errors of law, including those that may infect a so-called mixed finding of law and fact, or a finding of fact that is predicated on a misunderstanding of the governing rule of law." *Bose Corp. v. Consumers Union of United States, Inc.,* 466 U.S. 485, 501, 104 S.Ct. 1949, 1960, 80 L.Ed.2d 502 (1984). Both sets of principles come into play on this appeal.

### 1. *Shipping as Publication*

■ We find no misapplication of law or clear error with respect to the trial court's rejection of Naval's principal argument in that court, *i.e.,* that Berkley had no right under the Agreement even to ship prior to October 1985. In pursuit of this argument, Naval relies in large part on copyright principles. The copyright statute defines "publication," in part, as "the distribution of copies ... of a work to the public by sale or other transfer of ownership .... The offering to distribute copies ... to a group of persons for purposes of further distribution ... constitutes publication." 17 U.S.C. § 101 (1982). The statutory definition, though perhaps instructive, is not dispositive, for the parties were free to agree on a different meaning for the term "publish."

In the paragraph entitled "Publication by Licensee," the Agreement provided merely that Berkley could publish "not sooner than October 1985." From this provision it was surely permissible to infer that the parties intended to allow Berkley to make the paperback available to the public on October 1. The court's finding that it was the industry custom and practice to ship sufficiently early to permit sale on the publication date specified in the license was not clearly erroneous, and it was not error to impute knowledge of that custom and practice to Naval. Given that the acts constituting publication within the meaning of the Agreement were not spelled out in that document, and given Naval's constructive knowledge of the custom and practice as to early shipping, it was permissible for the court to infer that the Agreement permitted Berkley to perform preparatory acts that would allow it to have the paperback edition available for sale to the public on October 1. Accordingly, we conclude that the trial court's finding that the Agreement permitted Berkley to ship before October 1985 was not erroneous.

### 2. *Substantial Sales as Publication*

■ There remains the question of whether the Agreement prohibited substantial pre-October 1985 retail sales. The trial court implicitly arrived at a negative answer, apparently viewing that answer as inferrable from its finding that the Agreement permitted pre-October 1985 shipping. It does not follow from Naval's constructive knowledge of industry custom permitting early shipping, however, that Naval intended to permit voluminous pre-October sales, and we conclude that in drawing its inference, the court failed to give appropriate effect to pertinent legal principles.

The court should interpret a contract in a way that ascribes meaning, if possible, to all of its terms, *see, e.g., Spaulding v. Benenati,* 57 N.Y.2d 418, 425, 456 N.Y.S.2d 733, 736, 442 N.E.2d 1244, 1247 (1982); *Corhill Corp. v. S.D. Plants, Inc.,* 9 N.Y.2d 595, 599, 217 N.Y.S.2d 1, 3, 176 N.E.2d 37, 38 (1961); *Rentways, Inc. v. O'Neill Milk & Cream Co.,* 308 N.Y. 342,

347, 126 N.E.2d 271, 273 (1955); *Restatement (Second) of Contracts* § 203(a) (1981), giving due consideration to the purpose to be accomplished and the object to be advanced, *see M. O'Neil Supply Co. v. Petroleum Heat & Power Co.,* 280 N.Y. at 55, 19 N.E.2d at 679; *William C. Atwater & Co. v. Panama R.R. Co.,* 246 N.Y. 519, 524, 159 N.E. 418 (1927). Where the parties ascribed different meanings to a term, the court must determine whether there was a meeting of the minds, *i.e.,* "whether either one of them knew, or had reason to know, that the other gave a particular meaning to the quoted words and assented in reliance thereon." 3 *Corbin on Contracts* § 537, at 45. If neither party knew or had reason to know of the other's interpretation, the court may be forced to conclude that there was no meeting of the minds and that hence there was no contract. *Id.* at 50. Finally, if, after all of the other guides to interpretation have been exhausted and the court concludes that there remain two reasonable interpretations of the contract, with each party knowing or having reason to know of the other party's understanding of the term, the court should as a policy matter, assuming it is clear that the parties have indeed attempted to enter into a contract, choose the interpretation that is adverse to the party that drafted the contract. *See, e.g., 67 Wall Street Co. v. Franklin National Bank,* 37 N.Y.2d at 249, 371 N.Y.S.2d at 918, 333 N.E.2d at 186; *Rentways, Inc. v. O'Neill Milk & Cream Co.,* 308 N.Y. at 348, 126 N.E.2d at 273-74; 3 *Corbin on Contracts* § 559, at 262. The district court's decision did not apply these principles to the question of whether the term "publish the ... paperback edition not sooner than October 1985" forbade substantial retail sales of that edition prior to that date.

In ruling that Naval had no valid claim against Berkley, the court inferred that Berkley was permitted to cause voluminous paperback sales well in advance of the earliest permitted date of publication. Yet it is plain that the words "publish ... not sooner than" are words of limitation. The trial court should have sought an interpretation of the "not sooner than" phrase that would have given that limitation some meaning.

Naval contended, *inter alia,* that "publish ... not sooner than" was intended to prohibit at least pre-October 1985 retail sales. Berkley's position was that license to ship prior to October exonerated it from liability for all ensuing pre-October sales. Thus, Berkley's view, like that ultimately adopted by the district court, was that the "not sooner than" phrase did not require Berkley to withhold the paperback from retail sale prior to October 1985. However, in order to determine whether that phrase did impose such a limitation, the court should have explored whether Berkley knew or had reason to know of Naval's understanding of the phrase. The record here makes clear that Berkley had ample reason to know that Naval intended a prohibition against voluminous pre-October sales. It was the custom in the industry to delay paperback publication until one year after the month of the hardcover edition; it was on this basis that Berkley filled in the October 1985 date on its form. Berkley's three industry witnesses stated that the reason for this 12-month delay was to provide a period in which the paperback edition would not compete with the hardcover edition. One such witness repeatedly referred to this period as the hardcover edition's "window of opportunity." Berkley cannot have been unaware that the reason for a softcover licensing agreement's provision for the publication of a paperback edition "not sooner than" a given date is that sales of the hardcover edition of any book diminish sharply after a less expensive softcover edition becomes available. *See Bouton v. World Publishing Co.,* Index No. 19705/1970 (Sup.Ct., N.Y. County, Special Term, December 11, 1970). In *Bouton,* the paperback license provided that "the Publisher may publish a softcover edition not earlier than one year ... after the hardcover edition." The court there concluded that sale of the paperback edition during that year would obviously violate the contract.

We think the same conclusion must be drawn here. Berkley must be deemed to have had constructive knowledge that Naval intended that there not be sales of the paperback edition of *Red October* during the one-year period in which the hardcover edition would normally be the only edition. And if the Agreement's prohibition on "publish[ing]" sooner than October 1985 did not at least forbid voluminous paperback retail sales during that period, we would be at a loss to see that the term "not sooner than" had any meaning whatever. Thus, proper application of principles of contract interpretation requires the conclusion that at the very least, the Agreement's ban on pre-October 1985 publication meant that Berkley was not permitted to cause a sufficient volume of sales of its edition of the Book to allow that edition to become a bestseller weeks in advance of the earliest permissible date of publication.

Given this view of the Agreement, it is clear that Naval established Berkley's liability. Approximately 400,000 copies of the paperback version were sold at retail prior to October 1. By mid-September Berkley's paperback edition of the Book was already near the top of the bestseller lists of major national bookstore chains. Ranking second or third in paperback sales volume at a total of more than 1,500 Waldenbook and B. Dalton stores for the week ending September 20, the Berkley edition arrived at 100 more stores in these chains alone the following week, and "sales increased substantially." 687 F.Supp. at 118.

We are unpersuaded by Berkley's contention that it should escape liability because, in order to offer the paperback for sale on October 1, it needed to ship weeks earlier, and that retailers will place a book on sale upon its arrival. We know of nothing that would have prevented Berkley from notifying retailers that the paperback edition was not to be placed on sale prior to October 1, and we know of no reason why Berkley should not be held accountable for the substantial pre-October sales that occurred as a result of its actions. In any event, even if the court concluded that one of the reasonable interpretations of the Agreement would permit Berkley to cause voluminous pre-October retail sales of the paperback edition during the hardcover edition's one-year "window of opportunity," the court should have construed the Agreement most strongly against Berkley, the party that prepared it, and concluded that the limitation on "publish[ing]" prior to October 1985 meant that Berkley was not permitted to cause substantial retail sales prior to that date.

We recognize that in most instances, breach of a contractual limitation on publication of the paperback "not sooner than" one year after the month of publication of the hardcover edition is unlikely to be material. The evidence at trial was that even a successful hardcover edition normally remains popular for no more than three or four months. Thus, the publisher of that edition is usually unconcerned and uninjured by an early release of the paperback edition. But the fact that early publication of the paperback edition is usually uncontested cannot deprive an injured hardcover publisher of the right to enforce the agreed-upon limitation.

In sum, we conclude that the trial court erred in not concluding that Berkley's paperback edition of *Red October* was "publish[ed]" within the meaning of the Agreement when significant retail sales of that edition were made to the public. Naval is entitled to judgment against Berkley, and we remand to the district court for further proceedings not inconsistent with this opinion and for the fashioning of appropriate relief.

### CONCLUSION

For the foregoing reasons, the judgment of the district court is reversed, and the matter is remanded.