692

**UNITED STATES NAVAL INSTITUTE,**
Plaintiff–Appellant–Cross–Appellee,

v.

**CHARTER COMMUNICATIONS, INC.,**
and Berkley Publishing Group, Defendants–Appellees–Cross–Appellants.

**Nos. 751, 897, Dockets 90–7749, 90–7795.**

United States Court of Appeals,
Second Circuit.

Argued Jan. 7, 1991.
Decided June 18, 1991.

Robert C. Osterberg, New York City (Abeles Clark & Osterberg, New York City, on the brief), for plaintiff-appellant-cross-appellee.

Robert M. Callagy, New York City (Mark A. Fowler, Satterlee Stephens Burke & Burke, New York City, on the brief), for defendants-appellees-cross-appellants.

Before KEARSE, WINTER and ALTIMARI, Circuit Judges.

KEARSE, Circuit Judge:

This case returns to us following our remand in *United States Naval Institute v. Charter Communications, Inc.,* 875 F.2d 1044 (2d Cir.1989) (*"Naval I"*), to the United States District Court for the Southern District of New York, Pierre N. Leval, *Judge,* for the fashioning of relief in favor of plaintiff United States Naval Institute ("Naval") against defendant Charter Communications, Inc., and Berkley Publishing Group (collectively "Berkley"), for breach of an agreement with respect to the publication of the paperback edition of *The Hunt For Red October* ("*Red October*" or the "Book"). On remand, the district court awarded Naval $35,380.50 in damages, $7,760.12 as profits wrongfully received by Berkley, and $15,319.27 as prejudgment interest on the damages awarded, plus costs. Naval appeals from so much of the judgment as failed to award a greater amount as profits, denied prejudgment interest on the profits awarded, and refused to award attorney's fees under the Copyright Act of 1976, 17 U.S.C. § 101 *et seq.* (1988) (the "Copyright Act" or the "Act"). Berkley cross-appeals from the judgment as a whole and from such parts of it as awarded moneys to Naval. For the reasons below, we reverse the award of profits; we affirm the award of damages, the award of prejudgment interest, and the denial of attorney's fees.

## I. BACKGROUND

The events leading to this action are fully set forth in *Naval I,* 875 F.2d at 1045–47, and will be summarized here only briefly. Naval, as the assignee of the author's copyright in *Red October,* entered into a licensing agreement with Berkley in September 1984 (the "Agreement"), granting Berkley the exclusive license to publish a paperback edition of the Book "not sooner than October 1985." Berkley shipped its paperback edition to retail outlets early, placing those outlets in position to sell the paperback prior to October 1985. As a result, retail sales of the paperback began on September 15, 1985, and early sales were sufficiently substantial that the Book was near the top of paperback bestseller lists before the end of September 1985.

Naval commenced the present action when it learned of Berkley's plans for early shipment, and it unsuccessfully sought a preliminary injunction. After trial, the district judge dismissed the complaint. He ruled that Berkley had not breached the Agreement because it was entitled, in accordance with industry custom, to ship prior to the agreed publication date. On appeal, we reversed. Though we upheld the district court's finding that the Agreement did not prohibit the early shipments themselves, we concluded that if the "not sooner than October 1985" term of the Agreement had any meaning whatever, it meant at least that Berkley was not allowed to cause such voluminous paperback retail sales prior to that date, and that Berkley had therefore breached the Agreement. *Naval I,* 875 F.2d at 1049–51. Accordingly, we re-

manded for entry of a judgment awarding Naval appropriate relief.

On the remand, Naval asserted that it was entitled to recovery for copyright infringement, and it sought judgment awarding it all of Berkley's profits from pre-October 1985 sales of the Book; it estimated those profits at $724,300. It also requested prejudgment interest, costs, and attorney's fees. Berkley, on the other hand, challenged Naval's right to any recovery at all, contending, *inter alia*, that Berkley could not be held liable for copyright infringement since the Agreement had made it the exclusive licensee of the paperback edition copyright as of September 14, 1984; it argued that Naval therefore had at most a claim for breach-of-contract but that Berkley could not be held liable on that basis because Naval had disavowed its pursuit of a contract claim. Berkley also argued that the profits attributed to it by Naval were inflated, and it opposed any award of prejudgment interest or attorney's fees.

In a Memorandum and Order dated July 17, 1990, 1990 WL 104027 ("July 17 Order"), the district judge rejected Berkley's claim that "its premature publication of the paperback edition constituted only a contract violation and not an infringement of Naval's copyright." *Id.* at 8. He found that Naval's copyright was infringed by the early publication because, though "the *extent* of the breach was a relatively trivial matter of two weeks of sales, the *term* breached was crucial to the scope of the license, as it governed when the license would take effect." *Id.* (emphasis in original). He concluded that Naval was entitled to recover damages for copyright infringement, comprising actual damages suffered by Naval plus Berkley's profits "attributable to the infringement," 17 U.S.C. § 504(b).

The court calculated Naval's "actual damages from Berkley's wrongful pre-October 'publication'" as the profits Naval would have earned from hardcover sales in September 1985 if the competing paperback edition had not then been offered for sale. July 17 Order at 8. Noting the downward trend of hardcover sales of the Book from March through August 1985, the court found that there was no reason to infer that Naval's September 1985 sales would have exceeded its August 1985 sales. The court calculated Naval's lost sales as the difference between the actual hardcover sales for those two months, and awarded Naval $35,380.50 as actual damages.

The district judge held that Berkley's profits "attributable to the infringement" were only those profits that resulted from "sales to customers who would not have bought the paperback but for the fact it became available in September." July 17 Order at 10. He found that most of the September paperback sales were made to buyers who would not have bought a hardcover edition in September, and therefore only those September sales that displaced hardcover sales were attributable to the infringement. Berkley's profit on the displacing copies totaled $7,760.12, and the court awarded that amount to Naval.

The court awarded Naval prejudgment interest (totaling $15,319.27) on the $35,380.50 awarded as actual damages but denied such interest on the award of Berkley's profits. It also denied Naval's request for attorney's fees.

Judgment was entered accordingly, and these appeals followed.

## II. DISCUSSION

On appeal, the parties pursue most of the contentions they urged in the district court on remand. Naval challenges so much of the judgment as (1) failed to award it, as damages for copyright infringement, a greater amount reflecting Berkley's profits, (2) denied it prejudgment interest on the award of Berkley's profits, and (3) denied it attorney's fees. Berkley challenges the judgment as a whole, contending that it is entitled to judgment in its favor because (a) it cannot be held to have infringed the copyright since it was an exclusive licensee, and (b) Naval renounced its claim for breach of contract. Alternatively, it contends that Naval failed to prove actual damages and hence the court's award of $35,380.50 must be set aside or reduced. It challenges the award of prejudgment inter-

est. For the reasons below, we conclude that Naval is not entitled to recover for copyright infringement or to be awarded attorney's fees. Naval is, however, entitled to recover for breach of contract, and we affirm the district court's award of actual damages and of prejudgment interest.

### A. Naval's Claim of Copyright Infringement

Under the Copyright Act, "[a]ny of the exclusive rights comprised in a copyright ... may be transferred ... and owned separately. The owner of any particular exclusive right is entitled, to the extent of that right, to all of the protection and remedies accorded to the copyright owner by this title." 17 U.S.C. § 201(d)(2). An exclusive license granted by the copyright owner constitutes a transfer of ownership of the copyright rights conveyed in the license. *See id.* § 101 ("A 'transfer of copyright ownership' is an assignment, mortgage, exclusive license, or any other conveyance ... of a copyright or of any of the exclusive rights comprised in a copyright, whether or not it is limited in time or place of effect...."); *Wales Industrial Inc. v. Hasbro Bradley, Inc.,* 612 F.Supp. 510, 514 (S.D.N.Y.1985) (Weinfeld, *J.*).

■ Copyright "[i]nfringement is the violation of an owner's copyright interest by a non-owner.... It is elementary that the lawful owner of a copyright is incapable of infringing a copyright interest that is owned by him." *Cortner v. Israel,* 732 F.2d 267, 271 (2d Cir.1984). Hence, an exclusive licensee of any of the rights comprised in the copyright, though it is capable of breaching the contractual obligations imposed on it by the license, cannot be liable for infringing the copyright rights conveyed to it. *See Fantastic Fakes, Inc. v. Pickwick International, Inc.,* 661 F.2d 479, 483–84 (5th Cir. Unit B 1981) ("mere breach of covenant may support a claim of damages for breach of contract but will not disturb the remaining rights and obligations under the license including the authority to use the copyrighted material"); *see also* 3 M. Nimmer & D. Nimmer, *Nimmer On Copyright,* § 12.02 at 12–29 (1990)

("Once the copyright owner grants an exclusive license of particular rights, only the exclusive licensee and not his grantor may sue for later occurring infringements of such rights. Indeed, the licensor may be liable to the exclusive licensee for copyright infringement if the licensor exercises rights which have theretofore been exclusively licensed." (Footnote omitted.)).

■ The Agreement between Naval and Berkley, headed "Agreement made this 14th day of September 1984," granted Berkley, in ¶ 1, "the exclusive right to publish and reproduce, distribute and sell English-language paperback editions" of the Book in the United States and certain other areas. Paragraph 2 of the Agreement stated that "[t]he term of this license will begin on the date written above"; it stated that the term of the license would continue until at least five years after the date of Berkley's "first publication" of the Book. Paragraph 4 provided that Berkley was to publish the paperback edition "not sooner than October 1985."

These provisions contradict the district court's finding that Berkley's publication date "governed when the license would take effect." Paragraph 2 provided that the license took effect on "the date written above"; since September 14, 1984, was the only date mentioned in the Agreement prior to ¶ 3, the license term began on that date. Further, ¶ 2's distinct references to (a) "the date written above" to define the start of the license term, and (b) Berkley's "first publication" date to anchor the continuation of the license term reveal that the parties deliberately did not define the start of the term by Berkley's first publication date. Thus, according to the express provisions of the Agreement, Berkley became the owner of the right to publish the paperback edition of the book in September 1984 and remained the owner of that right for at least five years after its first publication of that edition in 1985. Its publication of that edition in 1985 therefore could not constitute copyright infringement.

In arguing the contrary, Naval relies principally on *Kamakazi Music Corp. v. Robbins Music Corp.,* 684 F.2d 228 (2d

Cir.1982); *Gilliam v. American Broadcasting Companies, Inc.,* 538 F.2d 14 (2d Cir.1976); and *The Robert Stigwood Group Limited v. Sperber,* 457 F.2d 50 (2d Cir.1972). Its reliance is misplaced since in each of those cases the plaintiff, not the defendant, owned the pertinent copyright rights at the time of the infringements for which the plaintiff sued. In addition, Naval seeks to suggest that in *Naval I* this Court upheld its claim for copyright infringement. That suggestion is wishful thinking. Though we ruled that Berkley was liable for breaching the Agreement, we nowhere suggested that it had infringed the copyright.

In sum, though we ruled in *Naval I* that Berkley is liable to Naval for breach of the Agreement, Berkley is not liable for copyright infringement. It follows that the district court's award of relief under the Copyright Act must be set aside.

### B. *Contract Damages*

Our ruling that Naval is not entitled to recover under the Copyright Act does not, as Berkley would have it, require the entry of judgment in favor of Berkley. Though Berkley argues that Naval had abandoned its contract claim for money damages prior to trial, we thereafter ruled in *Naval I* that Naval was entitled to recover for breach of contract. Berkley did not seek reargument of our decision on the ground of the alleged abandonment; nor is it clear that such an application would have been availing in light of Naval's request in its amended complaint for "such other and further relief as to [the] court may appear just and proper," and the requirement of Fed.R. Civ.P. 54(c), that "[e]xcept as to a party against whom a judgment is entered by default, every final judgment shall grant the relief to which the party in whose favor it is rendered is entitled, even if the party has not demanded such relief in the party's pleadings." Our ruling in *Naval I* that Naval was entitled to recover for breach of the Agreement is the law of the case, and we have been presented with no reason for disturbing that ruling, *see, e.g., Doe v. New York City Department of Social Services,* 709 F.2d 782, 789 (2d Cir.), *cert. denied,*

464 U.S. 864, 104 S.Ct. 195, 78 L.Ed.2d 171 (1983). As Naval has renounced any effort at rescission and has accepted Berkley's payments of substantial copyright royalties for paperback sales under the Agreement, plainly the relief to which Naval is entitled on its meritorious breach-of-contract claim is money damages.

The damages awarded by the district court on remand had two components: (1) Naval's lost profits resulting from Berkley's early publication of the paperback edition of the Book, and (2) Berkley's profits attributable to its assumed infringement. For the reasons discussed above, the latter component of the award cannot stand. The former component, however, may properly measure damages under a breach-of-contract theory.

■ Since the purpose of damages for breach of contract is to compensate the injured party for the loss caused by the breach, 5 *Corbin On Contracts* § 1002, at 31 (1964), those damages are generally measured by the plaintiff's actual loss, *see, e.g., Restatement (Second) of Contracts* § 347 (1981). While on occasion the defendant's profits are used as the measure of damages, *see, e.g., Cincinnati Siemens–Lungren Gas Illuminating Co. v. Western Siemens–Lungren Co.,* 152 U.S. 200, 204–07, 14 S.Ct. 523, 525–26, 38 L.Ed. 411 (1894); *Murphy v. Lifschitz,* 183 Misc. 575, 577, 49 N.Y.S.2d 439, 441 (Sup.Ct.N.Y. County 1944), *aff'd mem.,* 268 A.D. 1027, 52 N.Y.S.2d 943 (1st Dep't), *aff'd mem.,* 294 N.Y. 892, 63 N.E.2d 26 (1945), this generally occurs when those profits tend to define the plaintiff's loss, for an award of the defendant's profits where they greatly exceed the plaintiff's loss and there has been no tortious conduct on the part of the defendant would tend to be punitive, and punitive awards are not part of the law of contract damages. *See generally Restatement (Second) of Contracts* § 356 comment *a* ("The central objective behind the system of contract remedies is compensatory, not punitive."); *id.* comment *b* (agreement attempting to fix damages in amount vastly greater than what approximates actual loss would be unenforceable as impos-

ing a penalty); *id.* § 355 (punitive damages not recoverable for breach of contract unless conduct constituting the breach is also a tort for which such damages are recoverable).

Here, the district court found that Berkley's alleged $724,300 profits did not define Naval's loss because many persons who bought the paperback in September 1985 would not have bought the book in hardcover but would merely have waited until the paperback edition became available. This finding is not clearly erroneous, and we turn to the question of whether the district court's finding that Naval suffered $35,380.50 in actual damages was proper.

In reaching the $35,380.50 figure, the court operated on the premise that, but for the breach by Berkley, Naval would have sold in September the same number of hardcover copies it sold in August. Berkley challenges that premise as speculative and argues that since Naval presented no evidence as to what its September 1985 sales would have been, Naval is entitled to recover no damages. It argues alternatively that the court should have computed damages on the premise that sales in the second half of September, in the absence of Berkley's premature release of the paperback edition, would have been made at the same rate as in the first half of September. Evaluating the district court's calculation of damages under the clearly erroneous standard of review, *see Thyssen, Inc. v. S.S. Fortune Star*, 777 F.2d 57, 60 (2d Cir.1985), we reject Berkley's contentions.

■ The record showed that, though there was a declining trend of hardcover sales of the Book from March through August 1985, Naval continued to sell its hardcover copies through the end of 1985, averaging some 3,000 copies a month in the latter period. It plainly was not error for the district court to find that the preponderance of the evidence indicated that Berkley's early shipment of 1,400,000 copies of its paperback edition, some 40% of which went to retail outlets and led to the Book's rising close to the top of the paperback bestseller lists before the end of Sep-

tember 1985, caused Naval the loss of some hardcover sales prior to October 1985.

■ As to the quantification of that loss, we think it was within the prerogative of the court as finder of fact to look to Naval's August 1985 sales. Though there was no proof as to precisely what the unimpeded volume of hardcover sales would have been for the entire month of September, any such evidence would necessarily have been hypothetical. But it is not error to lay the normal uncertainty in such hypotheses at the door of the wrongdoer who altered the proper course of events, instead of at the door of the injured party. *See, e.g., Lamborn v. Dittmer*, 873 F.2d 522, 532–33 (2d Cir.1989); *Lee v. Joseph E. Seagram & Sons, Inc.*, 552 F.2d 447, 455–56 (2d Cir.1977); *W.L. Hailey & Co. v. County of Niagara*, 388 F.2d 746, 753 (2d Cir. 1967). *See generally Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 264–65, 66 S.Ct. 574, 579–80, 90 L.Ed. 652 (1946); *Restatement (Second) of Contracts* § 352 comment *a* ("Doubts are generally resolved against the party in breach."). The court was not required to use as the starting point for its calculations Naval's actual sales in the first half of September, *i.e.,* those made prior to the first retail sale of the paperback edition. Berkley has not called to our attention any evidence in the record to indicate that the sales in a given month are normally spread evenly through that month. Indeed, it concedes that "[t]o a large degree, book sales depend on public whim and are notoriously unpredictable...." (Berkley brief on appeal at 31 n. 15.) Thus, nothing in the record foreclosed the possibility that, absent Berkley's breach, sales of hardcover copies in the latter part of September would have outpaced sales of those copies in the early part of the month. Though the court accurately described its selection of August 1985 sales as its benchmark as "generous[ ]," it was not improper, given the inherent uncertainty, to exercise generosity in favor of the injured party rather than in favor of the breaching party.

In all the circumstances, we cannot say that the district court's calculation of Naval's damages was clearly erroneous.

C. *Prejudgment Interest and Attorney's Fees*

█ The arguments as to prejudgment interest and attorney's fees need not detain us long. Under New York law, which the Agreement provided was to control, a plaintiff who prevails on a claim for breach of contract is entitled to prejudgment interest as a matter of right. *See* N.Y.C.P.L.R. §§ 5001, 5002 (McKinney 1963); *Bulk Oil (U.S.A.), Inc. v. Sun Oil Trading Co.*, 697 F.2d 481, 484–85 (2d Cir.1983); *Lee v. Joseph E. Seagram & Sons, Inc.*, 592 F.2d 39, 41 (2d Cir.1979). Having concluded that Naval is entitled to recover damages for breach of contract, we thus uphold the district court's award of prejudgment interest to Naval on the damages recovered.

█ There is no similar right to an award of attorney's fees on an ordinary claim of breach of contract. *See generally Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240, 247, 95 S.Ct. 1612, 1616, 44 L.Ed.2d 141 (1975). Thus, we affirm the district court's denial of attorney's fees.

### CONCLUSION

We have considered all the arguments made by both parties in support of their respective positions on these appeals and, except as indicated above, have found them to be without merit. For the foregoing reasons, we reverse so much of the judgment as granted Naval $7,760.12 as an award of Berkley's profits. In all other respects, the judgment is affirmed.

No costs.