**REEFER AND GENERAL SHIPPING CO., INC., Plaintiff,**

v.

**GREAT WHITE FLEET, LTD., Defendant.**

No. 93 Civ. 0906 (SWK).

United States District Court, S.D. New York.

June 22, 1994.

Reid & Priest by Louis H. Willenken, New York City, for plaintiff.

Clark & Atcheson by Richard J. Reisert, New York City, for defendant.

## MEMORANDUM OPINION AND ORDER

KRAM, District Judge.

In this admiralty and maritime action, plaintiff Reefer and General Shipping Co., Inc. ("Reefer") seeks damages against Great White Fleet, Ltd. ("GWF") for the wrongful termination of a charter party. Presently before the Court is GWF's motion, pursuant to Federal Rule of Civil Procedure 56, for summary judgment dismissing the complaint. For the reasons set forth below, GWF's motion is denied.

## BACKGROUND [1]

On December 7, 1990, Reefer and GWF entered into a Refrigerated Vessel Time–Charter (the "Charter"), pursuant to which GWF hired Reefer's ship, the Kinaros V (the "Vessel"), for two years.[2] Pursuant to paragraph 50 of the Charter, GWF could terminate the contract if the Vessel was deemed unseaworthy by a class surveyor[3] for the purpose of carriage maintenance or care of the cargo. See the Charter at ¶ 50, annexed to the Reisert Aff. as Exh. "3." In addition, paragraph 51 provided that GWF had the right to terminate the Charter if "the vessel or its refrigeration machinery and equipment breakdown for any reason whatsoever and such breakdown occurs on three occasions [sic] within a 12 month period." Id. at ¶ 51. The Charter provided, however, that GWF could not reduce payments unless a breakdown hindered the working of the Vessel for more than twenty-four hours. Id. at ¶ 11(A).

## I. Shipment of Bananas

The Vessel contains three diesel-powered generators that propel it and provide electricity to the refrigeration equipment. In October 1992, the Vessel loaded a cargo of bananas in Honduras for discharge in Italy and Iran. On October 15, 1992, while enroute to Italy, the Vessel's No. 1 and No. 3 generators failed, causing the Vessel to lose power (the "October 15th Failure").[4] As a result, the Vessel stopped at Cartegena, Spain for emergency repairs. Although the No. 3 generator was restored to service, the No. 1 generator could not be repaired at Cartegena. Thus, in order to avoid further delays, the Vessel sailed to Salerno, Italy, where a portable generator was installed as a substitute for the No. 1 generator.

Reefer's engineering crew continued to repair the No. 1 generator during the voyage

---

1. Unless otherwise noted, the following facts are taken from the pleadings, the parties Rule 3(g) statements, the affidavit of Richard J. Reisert in Support of Defendant's Motion for Summary Judgment, sworn to on July 6, 1993 (the "Reisert Aff."), the Affidavit of Louis H. Willenken in Support of Plaintiff's Opposition to Defendant's Motion for Summary Judgment, sworn to on August 5, 1993 (the "Willenken Aff."), and the Affidavit of John R. Webber, sworn to on September 9, 1993 (the "Webber Aff.").

2. The parties subsequently entered into an Addendum, dated October 4, 1991, extending the Charter for an additional two years.

3. A classification society surveys, inspects and approves vessels in order for them to obtain, inter alia, marine insurance. Such a society may remove a vessel from a class, retain a vessel "in class," or retain a vessel "in class" subject to recommendations or conditions of the class. See Affidavit of Joseph H. Winer, P.E., sworn to on July 6, 1993 at ¶ 2. A class surveyor is a police-man nominated by a vessel's classification society to ensure that the vessel meets the standards of the society.

4. GWF contends that the Vessel's generators also broke down on the following occasions: (1) the No. 1 generator shut down for repairs on April 29–30, 1992, due to a damaged liner; (2) the No. 2 generator was under repair from May 4–6, 1992, due to a breakdown of the No. 4 cylinder; (3) the No. 1 generator was under repair from May 7–9, 1992, due to a broken piston and fuel pump; (4) the No. 2 generator was stopped and damaged pistons were replaced on June 3–6, 1992; (5) the main engine was shut down on June 15, 1992, due to failure of the No. 6 cylinder; and (6) the main engine was shut down on September 18–19, 1992, due to a No. 1 fuel oil purifier (collectively, the "Six Incidents"). See letter from Richard J. Reisert to the Hon. Shirley Wohl Kram of 10/29/93, at 2. Reefer contends, however, that the Six Incidents were normal maintenance and repair activities, and did not constitute breakdowns.

from Italy to Iran, and spare parts were delivered to the Vessel at Fujairah, United Arab Emirates. After the repairs were completed, the portable generator was removed from the Vessel in Greece.

## II. Shipment of Citrus

On November 27, 1992, the Vessel sailed from Morocco, carrying a cargo of clementines destined for the United States and Canada. The Vessel arrived in New Bedford, Massachusetts on December 7, 1992. Upon arrival in New Bedford, United States Department of Agriculture ("U.S.D.A.") inspectors denied entry of the United States' portion of the cargo, finding that the Vessel had failed to comply with U.S.D.A. "Cold Treatment" regulations requiring it to carry the cargo at or below designated temperatures for a prescribed number of consecutive days.[5] Accordingly, after discharging her Canadian-bound cargo, the Vessel shifted to the New Bedford anchorage to complete Cold Treatment of the United States cargo.

## III. Termination of the Charter

On December 16, 1992, while still at anchor, the Vessel's three generators failed, causing a complete power outage of the ship, including a shutdown of the refrigeration plant (the "December 16th Blackout").[6] Although sufficient power was ultimately restored to enable the cargo to complete the Cold Treatment procedures, the No. 3 generator remained out of service. The Vessel discharged the United States cargo on January 6, 1993.

The Vessel was next scheduled to sail for Panama to load a cargo of bananas. Before departing New Bedford, however, crewmembers reported to GWF's agent that the Vessel was unseaworthy. Some crewmembers also wrote letters to the ship's Master indicating their refusal to sail and demanding a

full survey of the Vessel's seaworthiness. As a result, the Vessel was placed off-hire.

From January 7 through January 9, 1993, the Vessel was inspected by a class surveyor, members of the United States Coast Guard and several GWF representatives. Graham Anderson ("Anderson"), GWF's technical superintendent, found that "the vessel is not in a satisfactory condition for employment with Great White Fleet. Her seaworthiness is questionable and her ability to successfully carry a refrigerated cargo is doubtful to say the very least." *See* memorandum from Anderson to J. Parker of January 7, 1993, annexed to the Reisert Aff. as Exh. "26." In addition, Joseph H. Winer ("Winer"), GWF's cargo insurance underwriter, reported that "it is my firm opinion that the vessel in its present state is not at all suitable for reasonably reliable service in refrigerated trade." *See* telefacsimile from Joseph H. Winer to William E. O'Neil of 1/10/93, annexed to the Reisert Aff. as Exh. "4." Based on this report, the Vessel's cargo underwriters indicated that they were unable to insure the Vessel's cargo. *See* deposition of John Richard Webber, taken on June 29, 1993 (the "Webber Dep."), at 155, annexed to the Willenken Aff. as Exh. "1."

On January 8, 1993, GWF notified Reefer that it was terminating the Charter and redelivering the Vessel. Reefer refused to accept redelivery of the Vessel, however, stating that GWF's grounds for terminating the Charter were not valid. Reefer contends that GWF terminated the Charter because its corporate parent, Chiquita Brands International, Inc. ("Chiquita"), had instructed GWF to reduce costs after Chiquita suffered substantial losses in the banana market.

Subsequently, on January 9, 1993, a surveyor from the Nippon Kaiji Kyokai ("NKK") classification society issued a Survey Record (the "January 9th Survey") confirming the Vessel's seaworthiness to pro-

5. The parties dispute whether the Master of the Vessel was instructed to carry the United States cargo pursuant to Cold Treatment regulations. While GWF contends that it gave the Master clear instructions for the carriage of the cargo, Reefer argues that the Master never received precise, clear instructions for the cargo's carriage.

6. Reefer contends that the blackout was caused either by contaminated fuel supplied by GWF, or severe weather conditions encountered by the Vessel en route to New Bedford. *See* Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment, at 11.

ceed to Panama from New Bedford, subject to the condition that the No. 3 generator be repaired or equivalent measure taken before loading any cargo. *See* Survey Record, annexed to the Reisert Aff. as Exh. "20." A portable generator was subsequently installed on the Vessel's deck, and, on January 14, 1993, a NKK surveyor issued a Survey Record (the "January 14th Survey") confirming the Vessel's seaworthiness, subject to the condition that the No. 3 generator be repaired "by next docking survey but not later than the end of May 1993." *See* the Survey Record, annexed to the Willenken Aff. as Exh. "21." The surveyor also confirmed that the Vessel "with three generators, one of which is the portable aux. engine installed on deck can load a full refrigerated cargo." *Id.*

Subsequently, on January 25, 1993, the United States Coast Guard indicated that the Vessel was seaworthy for a trip to Panama. *See* letter from H.D. Robinson to Vessel Operations Manager of 1/25/93, annexed to the Willenken Aff. as Exh. "22."

### IV. The Current Action

On February 16, 1993, Reefer commenced this action for damages, alleging that GWF breached the Charter. GWF now moves for summary judgment dismissing the complaint on the grounds that it was entitled to terminate the Charter and redeliver the Vessel pursuant to paragraphs 50 and 51 of the Charter.

## DISCUSSION

### I. Standard for Summary Judgment

■ Under Rule 56(c) of the Federal Rules of Civil Procedure, a motion for summary judgment must be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party must initially satisfy a burden of demonstrating the absence of a genuine issue of material fact, which can be done merely by pointing out that there is an absence of evidence to support the nonmoving

party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25, 106 S.Ct. 2548, 2552–54, 91 L.Ed.2d 265 (1986). The nonmoving party then must meet a burden of coming forward with "specific facts showing that there is a genuine issue for trial," Fed.R.Civ.P. 56(e), by "a showing sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. at 322, 106 S.Ct. at 2552.

■ The Court "must resolve all ambiguities and draw all reasonable inferences in favor of the party defending against the motion." *Eastway Constr. Corp. v. New York*, 762 F.2d 243, 249 (2d Cir.1985); *see also Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–159, 90 S.Ct. 1598, 1608–09, 26 L.Ed.2d 142 (1970); *Hathaway v. Coughlin*, 841 F.2d 48, 50 (2d Cir.1988); *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 11 (2d Cir.1986), *cert. denied*, 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987). But the Court is to inquire whether "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for the party," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986), and to grant summary judgment where the nonmoving's evidence is merely colorable, conclusory, speculative or not significantly probative. *Id.* at 249–50, 106 S.Ct. at 2510–11; *Knight v. U.S. Fire Ins. Co.*, 804 F.2d at 12, 15; *Argus Inc. v. Eastman Kodak Co.*, 801 F.2d 38, 45 (2d Cir.1986), *cert. denied*, 479 U.S. 1088, 107 S.Ct. 1295, 94 L.Ed.2d 151 (1987). To determine whether the nonmoving party has met his or her burden, the Court must focus on both the materiality and the genuineness of the factual issues raised by the nonmovant. As to materiality, "it is the substantive law's identification of which facts are critical and which facts are irrelevant that governs." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 248, 106 S.Ct. at 2510. A dispute over irrelevant or unnecessary facts will not preclude summary judgment, *id.*, but the presence of unresolved factual issues that are material to the outcome of the litigation mandates a denial of the summary judgment motion.

*See, e.g., Knight v. U.S. Fire Ins. Co.,* 804 F.2d at 11–12.

Once the nonmoving party has successfully met the burden of establishing the existence of a genuine dispute as to an issue of material fact, summary judgment must be denied unless the moving party comes forward with additional evidence sufficient to satisfy his or her ultimate burden under Rule 56. *See Celotex Corp. v. Catrett,* 477 U.S. at 330, n. 2, 106 S.Ct. at 2556, n. 2 (Brennan, J., dissenting). In sum, if the Court determines that "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (quoting *First Nat'l Bank of Arizona v. Cities Serv. Co.,* 391 U.S. 253, 289, 88 S.Ct. 1575, 1592–93, 20 L.Ed.2d 569 (1969)); *see also Weg v. Macchiarola,* 654 F.Supp. 1189, 1191–92 (S.D.N.Y.1987).

## II. The "Breakdown" Clause

GWF moves for summary judgment dismissing the complaint on the grounds that it was entitled to terminate the Charter pursuant to paragraph 51. Paragraph 51 provides that GWF may terminate the Charter and redeliver the Vessel where "the vessel or its refrigeration machinery and equipment breakdown for any reason whatsoever and such breakdown occurs on three occassions [sic] within a 12 month period." *See* the Charter at ¶ 51. According to GWF, the October 15th Failure and December 15th Blackout consist of five breakdowns within a three month period. Alternatively, GWF argues that the Six Incidents each constitute a "breakdown" within the meaning of paragraph 51. As the Court finds that a genuine issue of material fact exists as to the definition of "breakdown," however, summary judgment is inappropriate.

■ A charter agreement is a contract, subject to all of the rules and requirements of contract law. *See A/S Custodia v. Lessin Int'l, Inc.,* 503 F.2d 318, 320 (2d Cir.1974). "When a court must interpret contractual language as part of a motion for summary judgment, it focuses on the plain meaning of the language in light of the intent of the parties." *Cramer v. Devon Group, Inc.,* 774 F.Supp. 176, 183 (S.D.N.Y.1991). Accordingly, the Court must first determine whether the language used is ambiguous, and then examine the inferences that can be drawn from the language. "It is only where the language *and* the inferences to be drawn from it are unambiguous that a district court may construe the contract as a matter of law and grant summary judgment accordingly." *Cable Science Corp. v. Rochdale Village, Inc.,* 920 F.2d 147, 151 (2d Cir.1990); *see also United States Naval Inst. v. Charter Communications, Inc.,* 875 F.2d 1044, 1048 (2d Cir.1989); *In re Gas Reclamation, Inc. Secs. Litig.,* 741 F.Supp. 1094, 1097 (S.D.N.Y. 1990).

■ The determination of whether a contract term is ambiguous is a threshold question of law for the Court. *See United States v. 0.35 Of An Acre Of Land,* 706 F.Supp. 1064, 1070 (S.D.N.Y.1988). Contract ambiguity is not established "simply because the parties disagree as to the meaning of a particular provision." *Id.; see also In re Gas Reclamation, Inc. Secs. Litig.,* 741 F.Supp. at 1097. Rather, in determining whether a contract term is ambiguous, the Court must analyze whether the term

> is one capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade of business.

*Walk–In Medical Ctrs., Inc. v. Breuer Capital Corp.,* 818 F.2d 260, 263 (2d Cir.1987) (quoting *Eskimo Pie Corp. v. Whitelawn Dairies, Inc.,* 284 F.Supp. 987, 994 (S.D.N.Y. 1968)).

■ In the instant case, the Court finds that the term "breakdown" as utilized in paragraph 51 of the Charter is susceptible to two reasonable interpretations. First, the plain meaning of the word "breakdown" leads the Court to the conclusion that the Vessel suffers a breakdown whenever any piece of its equipment fails to perform as required.

This interpretation is supported by the fact that the term "breakdown" in paragraph 51 is followed by the clause "for any reason whatsoever." According to this interpretation, GWF had the right to redeliver the Vessel if any of the ship's equipment failed to perform as required for any reason, even if the equipment was repaired immediately and the failure did not hinder or delay the Vessel's voyage. Thus, the October 15th Failure would consist of two breakdowns, and the December 16th Blackout would consist of three breakdowns. In addition, each of the Six Incidents would each be considered a breakdown.

A reading of the entire Charter, however, leads the Court to the conclusion that a more narrow definition of "breakdown" is also possible. *See United States Naval Inst. v. Charter Communications, Inc.*, 875 F.2d at 1049 (finding that courts "should interpret a contract in a way that ascribes meaning, if possible, to all of its terms"). Paragraph 11(A) of the Charter provides that GWF cannot place the Vessel off-hire and withhold payments unless (1) a breakdown hinders or prevents the working of the Vessel; and (2) such a breakdown continues for more than twenty-four hours. *See* the Charter at ¶ 11(A). Reading paragraphs 11(A) and 51 together, the Court finds that the term "breakdown" can be reasonably interpreted to signify an equipment failure that both hinders the Vessel's performance and lasts for longer than twenty-four hours. Under this interpretation, neither the October 15th Failure, the December 16th Blackout nor the Six Incidents would constitute "breakdowns," as none of them involved a delay in the Vessel's carriage or damage to the cargo.

The Court's conclusion that the term "breakdown" is subject to two reasonable interpretations is buttressed by the deposition testimony of John Richard Webber ("Webber"), GWF's director of operations. Webber testified that a breakdown does not occur "if it doesn't stop the vessel from performing her required voyage." *See* the Webber Dep. at 16. In addition, he testified that equipment failure does not constitute a breakdown unless it hinders "[t]he ability of the vessel to perform under the terms of the Charter Party." *Id.* According to this definition, a mechanical failure does not constitute a "breakdown" unless it hinders or delays the Vessel's execution of its obligations under the Charter.

At the same deposition, however, Webber also gave a broader definition of "breakdown." According to Webber, a breakdown is "a malfunction of any part of the ship's equipment which is at the Charterer's disposal." *Id.* at 14. He also defined "breakdown" as "a mechanical cessation of the essential functions of the vessel. The machinery, the auxiliary machinery, refrigeration." *Id.* at 21–22. This definition of "breakdown" encompasses any mechanical failure, whether or not it hinders the Vessel's performance, and without any consideration given to the length of time within which the malfunction is repaired.

In light of these contrasting definitions, the Court finds the term "breakdown" as used in paragraph 51 of the Charter to be ambiguous. Accordingly, the meaning of "breakdown" is an issue of fact, precluding summary judgment as a matter of law.

### III. The "Seaworthiness" Clause

■ GWF next moves for summary judgment dismissing the complaint on the grounds that it was entitled to terminate the Charter and redeliver the Vessel pursuant to paragraph 50 of the Charter. Paragraph 50 provides:

> If, during the term of the Charter, the vessel is deemed to be unseaworthy by a class surveyor for the purpose of carriage maintenance or care of Charterers cargo, then Charterers shall have the right to terminate this Charter.

*See* the Charter at ¶ 50. GWF argues that, as the January 9th Survey recommended that the No. 3 generator be repaired or equivalent measure taken before loading any cargo, the Vessel was therefore deemed unseaworthy by a class surveyor, triggering GWF's right to terminate the Charter under paragraph 50. The Court finds this argument unpersuasive.

The parties dispute whether the January 9th Survey confirmed the Vessel's seaworthi-

ness. Assuming the January 9th Survey did in fact indicate that the Vessel was unseaworthy, however, the Court finds that GWF did not rely on the class surveyor's record to terminate the Charter. Rather, GWF terminated the Charter on January 8, 1993, one day prior to the issuance of the January 9th Survey. As the class surveyor had not yet issued its findings on January 8, GWF was not entitled, under paragraph 50, to redeliver the Vessel on that day. Accordingly, GWF's motion for summary judgment on the ground that it had the right to terminate the Charter under paragraph 50 is denied.

## CONCLUSION

For the reasons set forth above, defendant GWF's motion for summary judgment is denied. The parties are directed to complete any remaining discovery, and to appear for a pretrial conference before this Court on Wednesday, September 21, 1994, at 10:30 a.m.

SO ORDERED.