## BAKERY & CONFECTIONERY WORKERS' INTERNATIONAL UNION, LOCAL NO. 492 v. NATIONAL BISCUIT CO.

### No. 9761.

United States Court of Appeals Third Circuit.

Argued Jan. 20, 1949.

Decided Nov. 2, 1949.

Edward Davis, Philadelphia, Pa., for appellant.

Charles J. Biddle, Philadelphia, Pa. (Lewis H. Van Dusen, Jr., Philadelphia, Pa., on the brief), for appellee.

Before GOODRICH, McLAUGHLIN and O'CONNELL, Circuit Judges.

O'CONNELL, Circuit Judge.

This suit is brought by plaintiff ("the union") on behalf of three employees of defendant ("the company") who have been compulsorily retired by the company under a retirement plan adopted by the company in 1946. Jurisdiction of the suit is asserted under Section 301(a) of the Labor-Management Relations Act, 1947, 29 U.S.C.A. § 185(a).[1] The action is bottomed upon alleged violations of employment contracts negotiated between the union and the company.

At the outset, we must stress that the instant suit is not one arising out of an unfair labor practice proceeding. The United States Court of Appeals for the Seventh Circuit, in Inland Steel Co. v. N.L.R.B., 7 Cir., 1948, 170 F.2d 247, certiorari denied as to this issue 1949, 336 U.S. 960, 69 S.Ct. 887[2] seems to us to point strongly to the

1. This section was adjudged constitutional in Wilson & Co. v. United Packinghouse Workers, D.C.S.D.N.Y., 83 F.Supp. 162.

2. The decisions of both the National Labor Relations Board and the U. S. Court of Appeals for the Seventh Circuit in

conclusion that the union would have been on firmer ground if it had chosen to seek appropriate relief in the proper forum on the theory that the company had been guilty of an unfair labor practice in refusing to bargain collectively concerning the so-called pension plan unilaterally instituted. Indeed, defense by the company upon such charges would face additional obstacles of substance, in that the company, having reserved to itself the right to amend and even cancel the plan at any time without liability therefor, gave itself the prerogative of actually utilizing the plan for other than the stated ends.[3]

Instead, the union has elected to assert, and here reiterates, that the compulsory retirement of the three employees was a kind of "lay-off" and consequently in violation of the "seniority and lay-offs" Article of the 1947 contracts. With this distinction in mind, we shall analyze the issue here presented.

The facts may be summarized as follows: There has been a continuous contractual relationship between the union and the company since May, 1939.[4] Effective May 1, 1946, the company voluntarily and unilaterally instituted a "Plan for Pensions," which included, inter alia, the following provisions: (1) the compulsory retirement of employees at the age of 65; (2) the payment, to those employees, of pensions determined according to their years of service and annual wages;[5] (3) "The company [defendant] reserves the right to modify, cancel or terminate * * * the plan or any part thereof at any time, which right shall include the right to cancel, terminate or decrease pensions already granted," and the plan gave nobody any enforceable right against the company; (4) all expenses of the plan were to be paid by the company; and (5) the plan was to receive prior approval by the stockholders of the company, as required by the laws of New Jersey.

One week prior to the effective date of the plan, one Soloner, the business agent of the union local, advised the company by letter that the employees of the Philadelphia plant at a regular meeting had unanimously protested against the compulsory retirement provision.[6] Four months later, on August 26, 1946, in preparation for negotiating a 1947 contract, a committee representing the union submitted to the company a written list of 19 demands, two of which were: "All promotions and lay-offs to be on a strict seniority basis," and "No employee may be compelled to retire on pension without his consent."[7] In the negotiations which ensued, the company took the position "that the establishment of a pension plan was an exercise of an inherent right of management" and "that the Pension Plan would be established, regardless of the wishes or approval" of the union.

In October and November of 1946, the company and union entered into collective bargaining agreements covering the two

the Inland Steel case were rendered subsequent to the filing of the complaint in the instant case. By 4-to-1, the N. L. R. B. held that pension plans are an appropriate matter for collective bargaining. The court of appeals was unanimous as to this issue. Accord, W. W. Cross & Co. v. N. L. R. B., 1 Cir., 1949, 174 F.2d 875.

3. As to whether the union rights were waived by entering into the contracts, see N. L. R. B. v. J. H. Allison & Co., 6 Cir., 1948, 165 F.2d 766, 768, certiorari denied, 1948, 335 U.S. 814, 69 S.Ct. 31; and see Tide Water Associated Oil Co., 85 N. L. R. B., No. 189, Case No. 2-C-6907, Sept. 6, 1949, abstracted at 2 C. C. H. Labor Law Rep. 4th ed., Par. 9207, and Allied Mills, Inc., 82 N. L. R. B., No. 99, Case No. 3-CA-78, April 7,

1949, reported in C. C. H. Labor Law Rep., 4th ed., National Labor Relations Board Decisions—1948-1949, Par. 8817.

4. In that month, the plant at Philadelphia was covered by a collective bargaining contract. The plant at York had its first such contract four years later.

5. For the purposes of the issue before us, our summation of these two features of the plan need not extend to related matters not here pertinent.

6. It is noted, however, that more than 500 of the company employees had been retired under the plan by October 24, 1947, and that the instant claim is directed only against the retirement of the three employees.

7. These were numbered 8 and 15, respectively.

plants. In several respects, the 1946 contracts were at variance with the 19 demands submitted by the committee two months earlier.[8] Nothing is found in the contracts as to a retirement plan or retirement pay. The contracts [9] did contain this provision (hereinafter referred to as "the Article"): "Article II. Section 1. Seniority and Lay-offs: Rules of seniority shall prevail with respect to lay off and rehiring of employees and disputes concerning seniority rights shall be settled by the Company and the Union. In the event work becomes slack, employees shall be laid off in the inverse order in which they were hired; that is, employees last hired shall be the first laid off. When rehiring takes place, those employees laid off last shall be rehired first and no new employees shall be hired until all the employees on the list of former employees have been rehired."

The record does not disclose whether or not this section appeared in any of the previous contracts which the company and the union made.

On August 13, 1947, shortly before the 1946 contracts were due to expire, the negotiations committee representing the union presented another written list of demands. Two of these are of moment to the case at bar: paragraph 2(c), that "No break in seniority for vacation purposes (or any other purposes) as a result of a temporary lay-off if employe reports to work at request of the company," and paragraph 6, that "Compulsory retirement shall be discontinued by the company even if it means the elimination of the present Nabisco Pension Plan." Again the company insisted that the plan was an exercise of the inherent right of management. On August 21, 1947, the company and the union agreed upon new contracts which, like the 1946 contracts, (a) included no specific provision concerning compulsory retirement, (b) varied in important respects from the demands of the union,[10] and (c) did continue the same "seniority and lay-offs" Article.

The three employees of the more than 500 retired under the plan on behalf of

8. Material differences included: (a) the increase in wages granted was appreciably less than that demanded; (b) the union asked for 1 week of vacation after six months of service, 2 weeks after one year, and 3 weeks after five years, but agreed to 1 week after twelve months of continuous service and 2 weeks after three years; (c) whereas the union wanted at least 10¢ per-hour premium pay for night work, it settled for 5¢ per-hour; (d) 11 holidays were sought by the union, with 7 being granted; (e) the contracts contained no provision corresponding to the union demand that the pay of old employees transferred to a lower paid classification be not reduced; (f) under the contract, "jury duty pay" was to be at straight-time hourly classi-

fication rates, with no stated exception for occasions when the jury service occurred on premium-pay work-days, although the union wanted the additional compensation; (g) there is no contractual provision to reflect the union demand that employees "receive full pay in lieu of compensation if injured on job," or that forty hours of pay per week be guaranteed, or that the uniforms supplied by the company be union-made.

9. While the contracts were not identical with one another, they were verbatim, or virtually so, in the passages hereinafter quoted.

10. An outline of several material differences would include the following:

| Union demands | Contracts |
| --- | --- |
| a. 25¢ per-hour wage increase | 10¢ per-hour increase |
| b. 3 weeks of vacation after 5 years of service | 3 weeks of vacation after 20 years of service |
| c. 8 paid holidays per year | 7 paid holidays per year |
| d. Eliminate clause requiring one day of work in holiday week to receive holiday pay | Clause retained |
| e. Eliminate labor-management and "no strike" clauses | Clauses retained |
| f. Free uniform clause in all agreements | No such clause for Philadelphia agreement |

whom the instant suit was brought were retired during the effective period of the August 21, 1947, contract. The union here, as in the court below, relies solely upon the argument that compulsory retirement of these employees was a "lay-off" within the meaning of the Article, quoted above, and that the company consequently committed a breach of contract as to each of these.

The district judge, granting a judgment on the pleadings in favor of defendant, found three cogent reasons for his conclusion: (1) the inconsistency of such interpretation with the assertion of the company throughout, that the plan was a prerogative of management;[11] (2) the lack of an explicit reference to the plan in the 1947 contract; and (3) "This phraseology [of the Article] would not ordinarily encompass this kind of permanent separation from the employ of the company." D.C. E.D.Pa.1948, 78 F.Supp. 517.

In construing the contract, we note first that it does not contain any provision as to how an employee's continuous service with the company shall be terminated, and secondly that the rules of seniority are limited and restricted to "lay off and rehiring." To be successful, therefore, the plaintiff must bring the action of the defendant within the meaning of "lay off."

■ In Fishgold v. Sullivan Drydock & Repair Corp., 1946, 328 U.S. 275, at pages 286 and 287, 66 S.Ct. 1105, 90 L.Ed. 1230, 167 A.L.R. 110, decided five months before the union and the company signed the 1946 contracts, the Supreme Court of the United States, quoting the Oxford English Dictionary, had recognized the sharp distinction between a temporary suspension of an employee's work, known in common and industrial parlance as a "lay-off," and "termination of the employment relationship or loss of a position."[12] The 1946 and 1947 contracts contain nothing to indicate that the contracting parties intended to use the term "lay-off" in any manner other than its common meaning. In fact, the contracts affirmatively support normal construing of the term; for, besides juxtaposing the apparently antithetical word "rehiring" in the same Article, and besides qualifying "laid off" therein with the clause "in the event work becomes slack"—persuasive indicia that the contracting parties had in mind and expressed a condition arising out of the fluctuations of business cycles rather than one emanating from considerations of age—all four contracts elsewhere used "lay-off" in connection with a temporary cessation caused by a breakdown of equipment. Guided by the precept that words used in a contract are to be construed uniformly throughout in the absence of express provision to the contrary, we should find it difficult indeed to extend the scope of the Article to include severences which contemplate permanent cessation of the active services.[13]

■ At best, therefore, the union could argue only that the contract, as shown by the circumstances surrounding their con-

11. The words of the district judge were: " * * * plaintiff is urging, in effect, that the company agreed to an interpretation clearly contrary to the position it adhered to in preliminary negotiations in two successive years. It does not seem reasonable that the company bargained the pension plan out of existence when it felt in two successive years that this was not a proper subject for collective bargaining at all." Bakery & Confectionery Workers' International Union, Local No. 492, v. National Biscuit Co., D.C., 78 F. Supp. 517, 519.

12. Cf. Aeronautical Industrial District Lodge 727 v. Campbell, 1949, 337 U.S. 521, 526–529, 69 S.Ct. 1287. See also Field Letter No. 9 prepared by the Bureau of Veterans' Reemployment Rights in cooperation with the Office of the Solicitor, U. S. Department of Labor, June 15, 1949. These "Questions and Answers" are reprinted in 2 C.C.H. Labor Law Reporter, 4th Ed., Par. 14021.

13. The union has stressed that, since the company could amend or cancel the retirement plan, if such were done it could result in the three employees being denied work while other individuals with less seniority remained gainfully employed. The answer to this argument, it seems to us, is that, while such action might constitute an unfair labor practice, it would fall afoul of no contractual provision, since the contracts did not cover termination of employees' continuous services.

summation and as interpreted by the contracting parties, did intend to embrace "retirement" within the term "lay-off." Here, however, the evidence to the contrary is overwhelming: (1) In both its 1946 and 1947 demands upon the company, the union listed separately its desires as to "lay-off" and "retirement" provisions, in language clearly indicating it did not include the one within the other, both those terms being used and without an allegation that the retirement plan was inconsistent with the Article; (2) the wording of the lay-off Article remained unchanged in 1947, despite the vigorous objections of the union to the pension plan; and (3) as the comparison set forth in footnotes 8 and 10 above unmistakably discloses, the 1946 and 1947 contracts differ appreciably from the demands, and it would seem unlikely that the union would twice submit "demands" for something which it already possessed. If the provisions for lay-off in the 1946 and 1947 contracts were intended by the union and the company to cover compulsory retirement, surely the union in negotiating for the 1947 contracts would not have demanded that "Compulsory retirement shall be discontinued by the company even if it means the elimination of the present Nabisco Pension Plan." In the light of these facts, we deem untenable any argument that "lay-off" was *intended* by the parties to include "retirement."

We are impelled to the conclusion, therefore, that the right of the union which the company here infringed was not a contractual one. Just as the discriminatory discharge of an employee for union activity would not have been a proper basis for a suit alleging violation of the contracts here involved, so was the compulsory retirement of the three employees. The union has not here sought the proper remedy.

For the reasons stated, the judgment of the district court will be affirmed.

GOODRICH, Circuit Judge (concurring).

The conclusion reached by the Court in this case seems to me correct. The opinion goes further than I should care to commit myself in making suggestions that the Union could have or might have complained of an unfair labor practice. It does seem to me, however, that the conclusion reached that the pension plan is not to be treated as "layoff" under the contract is the only sound conclusion possible. The Union more than once made a special issue of the pension provisions in contract negotiations and no term of the contract which followed mentioned them. For it to take the position subsequently that retirement under a pension plan is a layoff and already included in the contract seems to me to fly in the face of all the probabilities. I, therefore, agree that no recovery can be had.