**REEFER AND GENERAL SHIPPING CO., INC., Plaintiff,**

v.

**GREAT WHITE FLEET, LTD., Defendant.**

**No. 93 Civ. 906 (SWK).**

United States District Court,
S.D. New York.

April 17, 1996.

Reid & Priest L.L.P., by Christopher Connolly, Monica P. McCabe, New York City, for Plaintiff.

Clark & Atcheson, by Richard J. Reisert, Frank A. Atcheson, James R. Sanislow, New York City, for Defendant.

### *FINDINGS OF FACT AND CONCLUSIONS OF LAW*

KRAM, District Judge.

In this maritime contract dispute, plaintiff Reefer and General Shipping Co., Inc. ("Reefer") seeks damages against Great White Fleet, Ltd. ("GWF") in the amount of $2,405,712.52 plus interest and costs for the wrongful termination of a charter party. GWF counterclaims that it is entitled to losses resulting from Reefer's material breaches in the amount of $497,857.66 together with interest and costs. On October 11 through October 23, 1995, the Court held a bench trial on these claims.[1] As set forth fully in

---

1. By Memorandum Opinion and Order dated September 27, 1995, the Court granted in part

Reefer's motion *in limine* to strike GWF's maritime frustration defense. *See Reefer and Gen.*

the following findings of fact and conclusions of law, the Court finds in favor of defendant GWF in the amount of $347,163.68.

## FINDINGS OF FACT

### I. The Charter

On December 7, 1990, GWF, the chartering arm of Chiquita Brands food company, chartered the Kinaros V (the "Vessel") from Reefer under a refrigerated vessel time charter (the "Charter"). The Vessel is equipped with three diesel-powered auxiliary generators. One generator is sufficient to propel the Vessel if no cargo is being carried, but with a full cargo, a second generator is necessary, while the third generator operates in stand-by condition. The Charter originally covered a two-year period beginning January 12, 1991, but during the first year of operation of the Vessel, the parties executed an addendum, dated October 4, 1991, extending the Charter for an additional two years through January 12, 1995. This addendum provided for a higher charter rate, but all other terms remained the same.

Under the terms of the Charter, GWF was required to supply fuel for the Vessel meeting certain explicit specifications. Pl.'s Trial Exh. ("PX") 1 at ¶ 4. Reefer retained broad discretion to inspect and sample the fuel furnished by GWF. PX 1 at ¶ 5.

The chief negotiators of the Charter's terms were John R. Webber ("Webber"), GWF's director of operations, and Anthony Axentios ("Axentios"), Reefer's chartering manager. GWF relied on the "Baltime 39" charter form, widely used in the shipping industry, in drafting its own pro forma charter. Trial Tr. at 18, 344, 375. GWF's pro forma breakdown clause states: "If, during the terms of this charter, the vessel or its refrigeration machinery and equipment break down for any reason whatsoever and such breakdown occurs on two occasions, then Charterer shall have the right to terminate this charter." Def.'s Trial Exh. ("DX") 2 at ¶ 51.

In negotiating the terms of the Charter with Reefer, GWF sought the ability to terminate the agreement in the event that a number of breakdowns hindered the proper functioning of the Vessel. The inclusion of a breakdown clause in the Charter was meant to prevent a recurrence of a situation similar to that experienced by an earlier-chartered vessel, the Royal Reefer, which encountered numerous problems on its voyages. Trial Tr. at 372. Axentios, Reefer's negotiator, stated with respect to this provision: "[T]his was the clause I just didn't want to be in the charter party. I saw no reason for it to be in the charter party at all. So I just didn't want it in at any price, if at all possible." *Id.* at 78–79; *see also id.* at 25–26.

After extensive negotiations, Reefer agreed to the inclusion of the breakdown provision only after its applicability was limited to three breakdowns within a twelve-month period. The final provision included in the Charter as paragraph 51 (the "Breakdown Clause") thus read: "If, during the term of this Charter, the vessel or its refrigeration machinery and equipment breakdown [sic] for any reason whatsoever and such breakdown occurs on three occassions [sic] within a 12 month period, then Charterers shall have the right to terminate this Charter." PX 1 at ¶ 51.

At trial the parties presented widely varying accounts of what constitutes a breakdown under the Breakdown Clause. Testifying on behalf of Reefer, Axentios stated:

[F]or me a breakdown on a ship is a very, very serious matter and it would have to be something really whereby either the solution would be time consuming, would be expensive and would cause real great harm to the charterer, whether it be GWF or anybody else. For me it would have to be really something catastrophic which we wouldn't sort of envisage during the period of the charter.

Trial Tr. at 27. Based on this interpretation, Axentios concluded that although the various problems experienced were "regrettable accidents," none were breakdowns within the

*Shipping Co. v. Great White Fleet,* No. 93 Civ. 906, 1995 WL 575290 (S.D.N.Y. Sept. 28, 1995). Consequently, the maritime frustration defense was not presented at trial and shall not be discussed below.

meaning of the Breakdown Clause. *Id.* at 34, 35. In contrast, James Parker, GWF's vice president and general maritime counsel, testified that a relatively short sea stoppage to repair a part would constitute a breakdown under the Breakdown Clause. *Id.* at 374.

Webber, GWF's chief negotiator, testified equivocally in describing what constitutes a breakdown under the Breakdown Clause. Webber testified in his deposition that the term refers to an event hindering a vessel's performance, and that unless a voyage is frustrated, its performance is not hindered.[2] At various other times, however, Webber described a breakdown as "a malfunction of any part of the ship's equipment which is at the Charterer's disposal," "a failure that hinders the vessel's performance [or] the ability of the Vessel to perform under the terms of the Charter Party," and "a mechanical cessation of the essential functions of the vessel. The machinery, the auxiliary machinery, refrigeration." Webber Dep. at 14–16, 21–22. In testifying that frustration was required, Webber added that the time in which a Vessel must be delayed for a voyage to be frustrated would have to be analyzed on a "case-by-case basis." *Id.* at 18. At any rate, Webber's testimony that a breakdown must "frustrate" a voyage does not, as Reefer seems to argue, rise to the word's legal connotation. Based on his testimony elsewhere and the surrounding context, it appears he meant something akin to "impede" or "hinder" in using that term.[3]

## II. The Voyages

The Vessel experienced a number of difficulties in 1992 and early 1993. While the Vessel was in port in Mersin, Turkey on April 29 through April 30, 1992, the number one generator had to be shut down while its liner was repaired. Trial Tr. at 130–32, 177–80. A few days later, on May 2, while in the Mediterranean Sea en route to Spain, the main engine stopped for approximately one hour and twenty minutes for replacement of a cylinder exhaust valve while on a ballast, *i.e.* non-cargo, voyage. *Id.* at 262–63; DX 278. This stoppage was not recorded in the ship's logbooks, but was reported to Reefer's office, and the ship's master determined not to inform the charterers about it. *Id.*

On May 4 through May 6, 1992, a cylinder of the number two generator was replaced on a ballast voyage, and on May 7 through May 9, a fuel pump of the same generator was also replaced. Trial Tr. at 134–35. Both Panagiotis Karvelas ("Karvelas"), the captain of the Vessel, and Axentios testified that the repairs did not have a significant impact on the Vessel's operation, since only one generator was needed to power the Vessel during ballast voyages. *Id.* at 134–35, 181–2; DX 383(a) at 84–89.

While en route to Belgium on June 3 through June 7, 1992, cylinder covers and

---

2. The following colloquy took place in Webber's deposition regarding the scope of the term breakdown:

> Q. If there was a light bulb that were to break on the vessel, would you consider that a breakdown?
> A. No. It doesn't hinder the vessel's performance.
> Q. The breakdown has to hinder the vessel's performance?
> A. The ability of the vessel to perform under the terms of the Charter Party.
> Q. Suppose you're in a situation ... where something hinders the performance for 15 minutes; is that a breakdown?
> A. If it doesn't affect the operation of the vessel, no, it's not a breakdown, if it doesn't stop the vessel from performing her required voyage.
> Q. Suppose the vessel had to leave port 15 minutes later as a result of this event, this mechanical problem; would it then be considered a breakdown under your definition so it would have been hindered under my question for 15 minutes?
> A. My interpretation would be that if there was no frustration of the voyage, then ... there wouldn't have been any hinderance to the charter. There wouldn't have been any breakdown which would have caused me to have been disturbed by it.

Deposition of John R. Webber ("Webber Dep."), taken on June 29, 1993, at 16–17.

3. Webber testified at one point in his deposition:

> What we try to do, because of the Royal Reefer Clause or the Breakdown Clause, Clause 51, we tried to define what would constitute frustration and what would constitute frustration is the inability to be able to operate the vessel because of repeated failures of one type or another.

Webber Dep. at 264–65.

pistons of the number two generator were replaced while the Vessel was sailing with cargo. The other two generators were used to power the Vessel and maintain the correct temperature for the cargo while repairs were effected. Trial Tr. at 135–36, 183–87.

The Vessel stopped for approximately two hours on June 15, 1992 while travelling from Antwerp to Honduras to load cargo when the main engine shut down. The main engine cylinder exhaust valve was replaced, and the resulting delay may have affected the Vessel's estimated time of arrival in the next port. *Id.* at 136–37, 194–97; DX 383(b) at 27. Such a stoppage at sea should have been recorded in the deck log, but was not. Trial Tr. at 196. On July 13 through July 15, 1992, the number six cylinder of the main engine was replaced while the Vessel was in port discharging cargo. *Id.* at 137, 197–98; DX 383(b) at 55–57.

On September 18 and 19, 1992, while en route from Gibraltar to Panama on a ballast voyage, the main engine stopped for 11.5 hours. Trial Tr. at 137–38. No entries were made in the deck logs about this stoppage, and distance run entries were falsified or altered at some point.[4] *Id.* at 199–206; DX 383(c) at 23–24; PX 5(b) at 30–31; PX 6(b); PX 7(b). Similarly, on September 25, 1992, while in the Sargasso Sea en route to Honduras, the main engine shut down for unknown reasons for approximately eleven hours. This stoppage was also not recorded in the deck logs. Trial Tr. at 201; DX 383(c) at 30; PX 5(b) at 37; PX 6(b); PX 7(b).

On October 15, 1992, while travelling to Italy with a full load of bananas, two of the Vessel's three generators simultaneously failed for approximately 39.5 hours. DX 395(c). During this period the refrigeration machinery did not operate for several hours, but the banana cargo suffered no damage. Trial Tr. at 139, 141; Webber Dep. at 39, 43; PX 13. The Vessel was able to divert into

port in Cartagena, Spain with one generator in order to repair one of the two failed generators. Trial Tr. at 139. The Vessel was placed off-hire under paragraph 68 of the Charter.[5] *Id.* at 35–36, 266–67; DX 383(c) at 50; PX 6(b); PX 7(b). The Vessel resumed its voyage the next day with two working generators. Trial Tr. at 138–39, 267. The Vessel's class surveyor inspected the Vessel, and on October 20, 1992, certified that the Vessel was in satisfactory condition, subject to the recommendation that the number one engine be repaired. *Id.* at 140; PX 14.

The Vessel left Morocco on November 27, 1992, and arrived in New Bedford, Massachusetts on December 7. On December 16, while in port, all three engines failed, causing a complete blackout, including the shutdown of all refrigeration machinery for approximately twelve hours. Trial Tr. at 150, 269–70; DX 383(5) at 12; PX 6(b); PX 7(b). No cargo claims resulted from the blackout. Webber Dep. at 136, 138.

On December 29, 1992, the United States Coast Guard Marine Safety Office in New Bedford received an anonymous complaint stating that the Vessel was unseaworthy. DX 423. Between December 30, 1992 and January 14, 1993, Coast Guard officers boarded the Vessel seven times to investigate the Vessel's safety and seaworthiness. *Id.* The Coast Guard reported that "[t]he status of the generators was . . . deemed adequate (although one [the number three generator] was being repaired) since either [of] the two operable generators could easily handle the ship's propulsion and navigation systems." *Id.* The master had the bilges cleaned of excessive oil and had fuel tank vent flame screens replaced. *Id.*

The second crankpin of the Vessel's number three generator failed on January 3, 1993 in New Bedford. Trial Tr. at 168, 273–74; PX 21. Reefer replaced the number three

---

4. According to Karvelas, there is a discrepancy between the log books, as the original official logbook of the engine and the original official deck logbook contain no record of this occurrence. Only the off logbook of the engine contains a record of the event. Trial Tr. at 138.

5. Paragraph 68 (the "Refrigeration Clause") of the Charter states: "In the event of breakdown of the operation of vessel's refrigeration plant, the vessel to be off-hire and the Owners to accept responsibility for effecting necessary repairs and placing vessel back at the disposal of Charterers." PX 1 at ¶ 68.

generator with a portable auxiliary engine, PX 22; Webber Dep. at 323; Joint Pre–Trial Order Fact 38, but the incident was not reported in any of the Vessel's logs. Trial Tr. at 272–73; DX 383(5) at 30; PX 6(b); PX 7(b). Axentios testified that the inability to refrigerate at this time would constitute a breakdown under the Refrigeration Clause of the Charter. Trial Tr. at 95.

A GWF superintendent, Graham Anderson, boarded the Vessel on January 7, 1993 and delivered a note to the ship's master insisting that Nippon Kaiji Kyokai ("NKK"), the class surveyor of the Vessel, inspect the Vessel. PX 19. That same day, the Coast Guard informed the NKK representative that the Vessel should be inspected to determine its seaworthiness before allowing it to continue to Panama on its next scheduled voyage. Trial Tr. at 554; DX 423. On January 8, while NKK and the Coast Guard were aboard the Vessel, they also investigated an oil leak between the number one fuel tank and the forepeak tank. DX 423. GWF notified Reefer by facsimile on January 8, 1993 that it was terminating the Charter and redelivering the Vessel.

On January 9, 1993, NKK certified that the Vessel was sufficiently seaworthy to proceed from New Bedford to Panama, recommending that the number three generator be repaired, or equivalent measure taken, before loading cargo and that the oil leak be checked and ultimately repaired. PX 21.

On January 14, 1993, a second NKK surveyor and the Coast Guard inspected the installation of the portable generator. The NKK surveyor issued a survey record stating, in part: "The undersigned [NKK surveyor] also confirmed that this vessel with three generators, one of which is the portable auxiliary engine on deck can load a full refrigerated cargo." PX 22. Before departing New Bedford, members of the crew complained to GWF's agent about the condition of the ship, alleging that the Vessel was unseaworthy. Joint Pre–Trial Order Fact 40.

## CONCLUSIONS OF LAW

### I. The Breakdown Clause

■ It is well-established that a charter agreement is a contract, subject to all of the rules and requirements of contract law. *A/S Custodia v. Lessin Int'l, Inc.*, 503 F.2d 318, 320 (2d Cir.1974); *Pollux Marine Agencies, Inc. v. Louis Dreyfus Corp.*, 455 F.Supp. 211, 219 n. 11 (S.D.N.Y.1978). In interpreting a contract, a court must inquire whether the term provision in question is ambiguous, *i.e.*, whether it is subject to at least two conflicting reasonable interpretations. *Mellon Bank, N.A. v. United Bank Corp.*, 31 F.3d 113, 116 (2d Cir.1994); *Monaghan v. SZS 33 Assocs.*, 875 F.Supp. 1037, 1043 (S.D.N.Y. 1995), *aff'd*, 73 F.3d 1276 (2d Cir.1996). Where the language is explicit and unambiguous, however, courts must give it its plain meaning. *Flair Broadcasting Corp. v. Powers*, 733 F.Supp. 179, 184 (S.D.N.Y.1990) ("If its language is plain, unambiguous, and capable of only one reasonable interpretation, no construction is required and the contract's language determines the instrument's force and effect.") (citation omitted); *Omaha Indem. Co. v. Johnson & Towers, Inc.*, 599 F.Supp. 215, 218 (S.D.N.Y.1984).

■ The interpretation of a contract is a mixed question of law and fact, and the court's ultimate objective in interpreting a contract is to determine the intentions of the parties as derived from the language employed in the contract. *Antilles S.S. Co. v. American Hull Ins.*, 733 F.2d 195, 199 (2d Cir.1984); *Tom Doherty Assocs. Inc. v. Saban Entertainment Inc.*, 869 F.Supp. 1130, 1137 (S.D.N.Y.1994), *aff'd*, 60 F.3d 27 (2d Cir.1995). In addition, a court should interpret a contract in such a way as to ascribe meaning to all of its terms whenever possible. *United States Naval Inst. v. Charter Communications, Inc.*, 875 F.2d 1044, 1049 (2d Cir.1989); *Chase v. Columbia Nat. Corp.*, 832 F.Supp. 654, 661 (S.D.N.Y.1993). Absent express provision to the contrary, contractual terms should be construed uniformly throughout the agreement. *Shuford Dev. Co. v. Chrysler Corp.*, 449 F.2d 429, 436 n. 8 (5th Cir.1971) (citing *Bakery & Confectionery Workers' Int'l Union, Local No. 492 v. National Biscuit Co.*, 177 F.2d 684, 687 (3d Cir.1949)); *Datatab, Inc. v. St. Paul Fire & Marine Ins. Co.*, 347 F.Supp. 36, 38 (S.D.N.Y.1972).

■ As previously noted by this Court in its June 22, 1994 decision, the term "breakdown" as used in the Breakdown Clause of the Charter is susceptible to at least two reasonable interpretations. *Reefer and Gen. Shipping Co. v. Great White Fleet*, 855 F.Supp. 651, 655–56 (S.D.N.Y.1994). Reefer asserts that the term refers only to breakdowns that fully frustrate voyages. This view is based primarily on Webber's testimony that frustration of a voyage is required for a contingency to sufficiently hinder the Vessel's performance such that it constitutes a breakdown. GWF, on the other hand, offers a more general "plain meaning" definition of the term. Under this analysis, a breakdown is a failure that hinders or prevents the working of the vessel. Based on the testimony presented at trial and reading the contract as a whole, the Court finds the latter view the more persuasive.[6]

■ A broad reading of the term "breakdown" is based on giving the term a uniform interpretation throughout the contract, as well as construing the plain meaning of the term. In determining the scope of the term "breakdown," several other clauses in the Charter are implicated. Paragraph 11(A) of the Charter (the "Off–Hire Clause") provides:

> In the event of drydocking or other necessary measures to maintain the efficiency of the vessel, deficiency of men or Owner's stores, breakdown of machinery, damage to hull or other accident, either hindering or preventing the working of the vessel and continuing for more than twenty-four (24) consecutive hours, no hire to be paid in respect of any time lost thereby during the period in which the vessel is unable to perform the service immediately required.

PX 1 at ¶ 11(A). The Charter provides several other damage remedies in the event of minor breakdowns of ship machinery and equipment, including: the Refrigeration Clause of paragraph 68 (deduct charter hire in the event of breakdown of the operation of vessel's refrigeration plant); the "Cleaning Main Engine" clause of paragraph 12 (deduct charter hire if cleaning of main engine pistons exceeds 24 hours); the "Time Lost" clause of paragraph 34 (deduct hire for time lost and extra fuel consumed if voyage speed reduced by breakdown); and the "Winch Breakdown" clause of paragraph 60 (reduce charter hire in the event of a winch or crane breakdown in certain cases). *See id.* at ¶¶ 68, 12, 34 and 60.

Reading these provisions together, it is apparent that Reefer's interpretation of a breakdown as an event frustrating an entire voyage would render these provisions meaningless. Reefer did not contest GWF's decision to place the Vessel off-hire under paragraph 68 during the October 15 incident, which lasted approximately 39.5 hours, *see* Trial Tr. at 80; DX 395(c), contradicting Reefer's assertion that full frustration would be necessary for a breakdown to have occurred. If anything, the term as used in the Breakdown Clause applies to more situations than it would under the Off–Hire Clause since the latter provision contains the qualifying language that such a breakdown must (1) hinder or prevent the working of the vessel and (2) continue for more than twenty-four consecutive hours.[7] Thus, the Off–Hire Clause is not triggered when breakdowns occur but these additional criteria are not satisfied. The Breakdown Clause contains no such restrictive language other than stating that termination is not appropriate unless three breakdowns occur within a twelve-month period. In addition, Axentios admitted that the December blackout incident and the January 3 crankpin failure constituted breakdowns under the Refrigeration Clause. Trial Tr. at 85, 95.

---

**6.** The fact that the term "breakdown" in the Breakdown Clause is followed by the phrase "for any reason whatsoever" does not necessarily support the former interpretation. Although the phrase could be interpreted to mean "to any extent," a more reasonable interpretation of the phrase is "regardless of the cause," and thus the phrase does not say anything about the size of the failure.

**7.** Contrary to plaintiff's assertion that a breakdown must last longer than 24 hours to trigger the Breakdown Clause, the Court does not find that the Off-Hire Clause compels this reading of the term "breakdown." Rather, the Off-Hire Clause provides only that the provision is not triggered unless a breakdown hinders the Vessel for longer than that period of time.

Requiring that a breakdown be an event that frustrates the purpose of the Charter would actually weaken GWF's position under law. Had the parties not expressly allocated the risk of unexpected contingencies, GWF would have been entitled to terminate the Charter under the doctrine of maritime frustration [8] if an unforeseen event not taken into account by the Charter occurred. Under Reefer's reading of the Breakdown Clause, three such events would have to occur before termination was allowed. Such a view is inconsistent both with the evidence presented at trial that GWF intended to protect itself in the event of accidents hindering the proper functioning of the Vessel, as well as with Reefer's assertion that the Breakdown Clause operated to the benefit of GWF. The cases cited by Reefer, *Dover S.S. Co. v. Summit Indus. Corp.*, 148 F.Supp. 206 (S.D.N.Y.1957) and *Aaby v. States Marine Corp.*, 181 F.2d 383 (2d Cir.1950), for the proposition that only a breach of warranty so substantial as to frustrate the purpose of the Charter would justify repudiation, are inapposite, since neither case involved an express provision similar to the Breakdown Clause allowing termination.

The Court finds that, at the very least, the September 18 and 19 incident, the September 25 incident, the October 15 incident, the December 16 incident,[9] and the January 3 incident were separate breakdowns under the Breakdown Clause of the Charter.

██ Reading the Charter as a whole, interpreting "breakdown" to refer to a failure hindering the proper functioning of the Vessel best gives a uniform interpretation to the term throughout the Charter and best captures the intent of the parties at the time of contracting. The Court finds that at least three breakdowns occurred within the meaning of the Breakdown Clause of the Charter within a twelve-month period.[10] Thus, GWF's redelivery of the Vessel was proper.

## II. Damages

GWF counterclaims that it is entitled to damages in the amount of $497,857.66. This includes $288,581.48, an amount Reefer stipu-

8. On September 27, 1995, the Court dismissed GWF's defense of maritime frustration, finding that, *inter alia*, the Breakdown Clause provided an express allocation of risk between the parties. *See Reefer and Gen. Shipping Co. v. Great White Fleet*, No. 93 Civ. 906, 1995 WL 575290 (S.D.N.Y. Sept. 28, 1995). Reefer's current position that full frustration is required on three separate occasions would render its earlier position that the parties contemplated such contingencies meaningless.

9. Reefer claims that the December 16 incident was the result of substandard fuel received while the Vessel was in Gibraltar, including water in the fuel, and thus GWF is responsible for any breakdown alleged. GWF counters that the fuel received on November 22, 1992 while in Gibraltar was within charter specifications. Trial Tr. at 288–89. In addition, GWF contends that Reefer may have been utilizing an "incompatible" mixture of fuel and diesel oils as a result of commingling different fuels in the same tank. It was this incompatibility that caused solid particles in the fuel to come out of suspension, it is argued, and this resulted in the Vessel's subsequent failures. *See id.* at 289–94. At any rate, GWF contends that the Vessel refrained from burning the contents of the water-filled number one fuel oil tank on its voyage to Morocco and then to New Bedford, *id.* at 232, 289, and the generators performed satisfactorily on the Atlantic crossing. *Id.* at 290, 298. The credible evi-

dence presented on these points supports GWF's position.

10. GWF's claim that it was entitled to redeliver the Vessel under the Seaworthiness Clause of paragraph 50 of the Charter is without merit. The Seaworthiness Clause, derived from GWF's pro forma charter, provides:

Owner represents and warrants that, during the term of this Charter, they shall maintain the vessel in a seaworthy condition in all respects. If, during the term of the Charter, the vessel is deemed to be unseaworthy by a class surveyor for the purpose of the carriage maintenance or care of Charterers cargo, then Charterers shall have the right to terminate this Charter.

PX 1 at ¶ 50.

As an initial matter, the Court finds that a determination of unseaworthiness by the class surveyor was a condition precedent to redelivery of the Vessel under paragraph 50. Since the class surveyor's report was not issued until January 8, 1993, a day after the Vessel was redelivered by GWF, they could not possibly have redelivered the Vessel in reliance upon the report. In any event, it is clear that the class surveyor did not find the Vessel unseaworthy. NKK confirmed in its January 9, 1993 report that the Vessel had "enough seaworthiness to proceed to Panama from New Bedford." PX 21. There is no indication in the report that the Vessel was unseaworthy in any respect.

lated at trial it owes GWF, plus $209,276.18 in disputed damages. This latter sum includes: 1) $17,832.20 worth of fuel oil bunkered at Gibraltar on November 21, 1992, which was not included by the master as part of the fuel inventory; 2) $40,750.00 in fuel oil in the forepeak tank; 3) $125,646.29 for the balance of off-hire due to additional time required to complete U.S.D.A. "cold treatment" process; 4) $7,743.70 in fuel oil and $13,974.00 in diesel oil consumed during the off-hire period; and 5) $3,329.99 worth of fuel claimed for overconsumption in 1991.

GWF has failed to establish Reefer's liability with respect to the cold treatment process. According to the Charter, the cooling instructions were GWF's responsibility, PX 1 at ¶ 10, and GWF has not established that responsibility for any damages caused by delayed discharge of the fruit in New Bedford does not lie with parties other than Reefer. Trial Tr. at 533–55.

Under paragraph 5 of the Charter, in the event of redelivery, Reefer is obligated to pay for fuel remaining on the Vessel. GWF has established an entitlement to $58,582.20 including $17,832.20 worth of fuel understated on the Vessel's reported fuel inventory and $40,750.00 worth of fuel remaining in the forepeak tank. *Id.* at 527; DX 395(e)–2; DX 421.

Finally, GWF's entitlement to $3,329.99 for an alleged overconsumption of fuel has not been adequately established. This claim apparently arises from a set of facts independent from those implicated in the present action. Such a complaint should have been separately pursued at the time the claim arose, and at any rate, damages and the responsibility for those damages have not been adequately proven.

Thus, GWF is entitled to the stipulated damages of $288,581.48 plus $58,582.20 for the fuel redelivered with the Vessel, for a total of $347,163.68.

### CONCLUSION

GWF properly redelivered the Vessel under the Breakdown Clause of the Charter, and thus the Court finds for GWF on the complaint and on its counterclaims, as de-

scribed above. Defendant is entitled to damages totalling $347,163.68. GWF shall submit an appropriate proposed judgment within thirty days of the date of this Memorandum Opinion and Order. Any objection must be submitted within two weeks of the submission of the proposed judgment.

SO ORDERED.