107 F.3d 4
 NOTICE: THIS SUMMARY ORDER MAY NOT BE CITED AS PRECEDENTIAL AUTHORITY, BUT MAY BE CALLED TO THE ATTENTION OF THE COURT IN A SUBSEQUENT STAGE OF THIS CASE, IN A RELATED CASE, OR IN ANY CASE FOR PURPOSES OF COLLATERAL ESTOPPEL OR RES JUDICATA. SEE SECOND CIRCUIT RULE 0.23.
REEFER AND GENERAL SHIPPING CO., INC.,
Plaintiff-Counter-Defendant-Appellant-Cross-Appellee,
v.
GREAT WHITE FLEET, LTD.,
Defendant-Counter-Claimant-Appellee-Cross-Appellant.
 Nos. 96-7891, 96-7959.
 United States Court of Appeals, Second Circuit.
 Feb. 12, 1997.
 
 1
 Appearing for Appellant: Peter J. Gutowski, Freehill, Hogan & Mahr, New York, New York.
 
 
 2
 Appearing for Appellee: Richard J. Reisert, Clark, Atcheson & Reisert, New York, New York.
 
 
 3
 Present: CARDAMONE, WINTER, Circuit Judges, and WARD, District Judge.*
 
 
 4
 Reefer and General Shipping Company, Inc. ("Reefer") appeals from a judgment entered after a bench trial before Judge Kram in its action against Great White Fleet, Ltd. ("GWF") for breach of a maritime contract. GWF cross-appeals from an adverse judgment on a counterclaim. Reefer was the owner of the Kinaros V (the "vessel"), an ocean-going refrigerated cargo vessel chartered by GWF in December 1990. The charter negotiations took as their starting point a draft prepared by GWF based on an industry form. The initial draft included a breakdown clause that provided that:
 
 
 5
 [i]f, during the terms of this charter, the vessel or its refrigeration machinery and equipment break down for any reason whatsoever and such breakdown occurs on two occasions, then Charterer shall have the right to terminate this charter.
 
 
 6
 Anthony Axentios, Reefer's chief negotiator, did not want this provision, and, after extensive negotiations between him and GWF's John R. Webber, the final breakdown provision stated:
 
 
 7
 If, during the term of this Charter, the vessel or its refrigeration machinery and equipment breakdown [sic] for any reason whatsoever and such breakdown occurs on three occassions [sic] within a 12 month period, then Charterers shall have the right to terminate this Charter.
 
 
 8
 The contract also contained a number of specific provisions governing the parties' rights concerning specific types of "breakdowns." Axentios testified that to him "breakdown" meant a catastrophic breakdown that would frustrate an entire voyage. James Parker, GWF's vice president and general maritime counsel, testified that even a relatively short stoppage would count as a breakdown. Webber testified that a breakdown required a failure that hinders the vessel's performance or ability to perform under the Charter and a mechanical cessation of the essential functions of the vessel. Webber also testified that for performance to be hindered a voyage has to be frustrated but stated that the length of a delay required for frustration of a voyage depended on a case-by-case analysis. The district court took Webber's use of "frustrate" as not rising to its potentially full legal connotation, but rather as meaning "impede" or "hinder." Reefer and Gen. Shipping Co. v. Great White Fleet, Ltd., 922 F.Supp. 935, 939 (S.D.N.Y.1996). The Charter originally provided for a two-year term beginning in January 1991, but in October 1991 the parties executed an addendum extending this period for an additional two years.
 
 
 9
 The vessel suffered from a number of problems in 1992 and early 1993. These included various shutdowns of the main engine, which were not recorded in the ship's deck logs. Two of these stoppages lasted approximately 11 hours. The problems also included a 39.5-hour simultaneous failure of all three generators, causing an unscheduled stop for repairs, and a simultaneous failure of all three engines in port, causing a complete blackout and shutdown of all refrigeration machinery for about 12 hours. Citing a variety of problems with the vessel, GWF terminated the charter on January 8, 1993.
 
 
 10
 The district court found that GWF's claim that the vessel was unseaworthy lacked merit but that it had the right to terminate the Charter under the Breakdown Clause. Id. at 940-42. The district court found the Breakdown Clause to be ambiguous if read in isolation but concluded that, in light of other breakdown provisions in the Charter and in light of evidence of the parties' intent, the breakdown clause referred to "a failure hindering the proper function of the vessel." Id. at 942.
 
 
 11
 On appeal, Reefer argues that the Breakdown Clause is unambiguous and that, even if it is ambiguous, the district court should have applied the rule of contra proferentem against GWF. We disagree.
 
 
 12
 Reefer argues that the Breakdown Clause is unambiguous in requiring that the same type of breakdown occur three times in a twelve-month period. It relies on the word "such" in the Breakdown Clause and claims that "such breakdown" means a breakdown in the same machinery. Reefer contends that otherwise there was no need to include the word "such." We disagree. The word "such" may easily be taken as a way of ensuring that the second use of "breakdown" also refers to the type of breakdown described earlier in the same sentence, i.e. a breakdown in the vessel or its refrigeration machinery and equipment.
 
 
 13
 Furthermore, taking "such" breakdown to mean "the same type of" breakdown does nothing to help decide what counts as a breakdown of "the same type." As GWF points out, the district court found that at least three of the breakdowns were generator breakdowns. Reefer replies that there is no evidence that the same one of the three generators broke down each time and that "such" requires more similarity between breakdowns, e.g. failure of the same crank pin in the same generator. However, even if Reefer were correct that "same" breakdown means "breakdown of the same type of machinery" there is still an ambiguity as to what counts as the same type of machinery. The word "such" is fully compatible with taking three generator breakdowns as three breakdowns of the same type.
 
 
 14
 Reefer next argues that the word "breakdown" should be read narrowly and that the district court erred in not applying the rule of contra proferentem to exclude any broader reading benefiting GWF. As is well-known, "[t]he rule of contra proferentem is that when one party is responsible for the drafting of an instrument, absent evidence indicating the intention of the parties, any ambiguity will be resolved against the drafter." Pagan v. NYNEX Pension Plan, 52 F.3d 438, 443 (2d Cir.1995) (citation and internal quotation marks omitted). Reefer contends that contra proferentem should be applied without reference to the parties' intent, but this flies in the face of our formulation of the rule. Id. Under our cases, the rule of contra proferentem is " 'used only as a matter of last resort after all aids to construction have been employed but have failed to resolve the ambiguities in the written instrument.' " United States Fire Ins. Co. v. General Reins. Corp., 949 F.2d 569, 573 (2d Cir.1991) (quoting Schering Corp. v. Hone Ins. Co., 712 F.2d 4, 10 n. 2 (2d Cir.1983)). The district court therefore was correct in not turning first to the rule of contra proferentem.
 
 
 15
 Furthermore, because the parties negotiated the terms of the Breakdown Clause, this is not an appropriate occasion to resort to the rule of contra proferentem. Reefer itself bargained for changes in the Breakdown Clause benefiting it. GWF is merely the author of the first draft of the Breakdown Clause, and the wording of the actual clause was the result of the parties' bargaining. The rule of contra proferentem is, therefore, simply inapplicable.
 
 
 16
 Reefer also argues against the district court's effort to reconcile the different uses of the word "breakdown" in various provisions of the Charter. But the district court was required to do so because terms in a contract are not to be taken in isolation but rather "a contract must be construed as a whole and the intention of the parties must be ascertained from the consideration of the entire contract, not some isolated portion." Hanson v. McCaw Cellular Communications, Inc., 77 F.3d 663, 668 (2d Cir.1996) (citation and internal quotation marks omitted). The district court reasoned that taking "breakdown" to mean an event that frustrates an entire voyage would render various other provisions meaningless, namely those providing other remedies for "breakdowns." Reefer argues that the provision of different remedies in the various clauses precludes similar treatment of "breakdown" across the clauses. We find, however, that the district court's definition of "breakdown" as an event hindering the operation of the vessel does capture the common element expressed by "breakdown" across these clauses.
 
 
 17
 Reefer's argument that the district court confused frustration of a voyage with frustration of the Charter is without merit. The district court addressed the possibility of "breakdown" requiring either of these two types of frustration and rejected both. See Reefer, 922 F.Supp. at 941-42.
 
 
 18
 As for GWF's cross-appeal, we affirm. The district court decided against GWF on its "counterclaim" that Reefer is liable for damages resulting from the need to cold treat cargo after the United States Department of Agriculture rejected the cargo at New Bedford because it had not yet been subjected to cold treatment. Reefer contends that the need for the cold treatment at New Bedford was GWF's fault because it allegedly gave faulty instructions to its subcharterer. GWF argues that the district court erroneously based its judgment on a failure of proof because, during the course of the trial, the district court, in an effort to avoid an unripe claim relating to litigation in Morocco, excluded evidence that each party wished to introduce on the cold treatment issue. We disagree.
 
 
 19
 GWF states that it "counterclaimed for the value of the time and fuel oil consumed as a result of the Vessel's failure to timely cold treat a cargo of Moroccan citrus in accordance with USDA procedures." GWF further contends that the district court was "uncertain" about how to deal with evidence relating to this "claim" because of the district court's desire to exclude evidence on an unripe claim for indemnity on the same cargo. This indemnity claim was dismissed without prejudice, as the court made clear in its June 19, 1996 order, which is not mentioned in either party's brief. Reefer and General Shipping Co. v. Great White Fleet, Ltd., 93 Civ. 906, at 4(SWK) (S.D.N.Y. June 19, 1996).
 
 
 20
 The district court made clear in its June 19, 1996 order that it was taking the "claim" for the value of time and fuel oil to be inseparable from the unripe indemnity claim. Reefer, 93 Civ. 906, at 3-4. This is understandable in light of GWF's answer and counterclaim and its offer of evidence at trial. What GWF describes as a counterclaim "for the value of the time and fuel oil consumed as a result of the Vessel's failure to timely cold treat a cargo of Moroccan citrus in accordance with USDA procedures" in fact reads as follows:
 
 
 21
 During the term of the Charter, plaintiff materially breached the Charter by permitting the Kinaros V to become unseaworthy and unfit in several respects, inter alia: ...
 
 
 22
 (f) the Vessel's officers were unskilled and inexperienced in the carriage of refrigerated cargoes required to be carried under U.S. Department of Agriculture regulations causing delay and damage to the Vessel's cargo and exposing Defendant to claims and liability as more fully set forth in Count III hereof.
 
 
 23
 The indemnity counterclaim in Count III refers to "damages due to the Vessel's failure to promptly and properly discharge all of the cargo." Thus, no mention is made of "fuel" and to the extent that "time" is involved, it is unclear from the counterclaim whether there is a claim for "time" other than that arising out of GWF's potential liability. In any event, there is at most a counterclaim for indemnity (Count III) and a counterclaim for unseaworthiness and unfitness (Count I), of which Paragraph 25(f) is allegedly an instance.
 
 
 24
 At best, GWF is asking us to find error in the exclusion of certain evidence at trial--in particular, if not exclusively, the complaint in the Moroccan litigation--because it related to an "unfitness claim" under Count I, apart from its unseaworthiness and indemnity claims. But this is not how GWF presented the issue of this evidence to the trial court. GWF presented this evidence on the New Bedford cold treatment issue as relating to indemnity or unseaworthiness, not to unfitness or anything else. Thus, the district court seems to have admitted much evidence on the cold treatment issue, and excluded the disputed evidence as relating to an unripe issue (indemnity) and as irrelevant to seaworthiness. This was not error.
 
 
 25
 Indeed, GWF seems to have framed as much of the dispute between it and Reefer in terms of "seaworthiness" in order to justify termination under the Charter's Unseaworthiness Clause. That strategy of course failed because the district court found GWF's contention that the vessel was unseaworthy to be without merit. Reefer, 922 F.Supp. at 942 n. 10. GWF appears not to have appealed from this determination, but if it has, we affirm. But, having chosen this strategy, it cannot now claim that the district court was "confused" because it failed to guess that GWF would later like to bring in the evidence in question under a rubric other than "seaworthiness."
 
 
 26
 If, on the other hand, the "fuel"-and-"time" claim is part of the indemnity claim, then it was dismissed without prejudice as not yet ripe, as discussed supra. GWF has not appealed from that dismissal either. We therefore conclude that the district court committed no error in excluding evidence that was offered to it as relating to indemnity and seaworthiness.
 
 
 27
 We therefore affirm.
 
 
 
 *
 The Honorable Robert J. Ward of the United States District Court for the Southern District of New York, sitting by designation